ROLLERBLADE, INC.,
Plaintiff–Appellee,

v.

UNITED STATES, Defendant–Appellant.

No. 96–1397.

United States Court of Appeals,
Federal Circuit.

April 24, 1997.

Amy M. Rubin, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, International Trade Field Office, New York City, argued, for defendant-appellant. With her on the brief was Joseph I. Liebman, Attorney in Charge. Also with her on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, Department of Justice, Washington, D.C. Of counsel on the brief was Mark G. Nackman, International Trade Field Office, of New York City.

Robert Torresen, Jr., Powell, Goldstein, Frazer & Murphy, Washington, D.C., argued, for plaintiff-appellee. With him on the brief were Richard M. Belanger and Todd J. Friedbacher.

Before RICH, CLEVENGER, and BRYSON, Circuit Judges.

CLEVENGER, Circuit Judge.

The United States appeals from the judgment of the United States Court of International Trade holding that the Customs Service (Customs) incorrectly classified the imported items at issue and ordering Customs to refund excess duties with interest to the importer, Rollerblade, Inc. (Rollerblade). We reverse because the items are properly classified as footwear and are not classifiable as parts of roller skates as the Court of International Trade held.

I

Rollerblade filed this lawsuit challenging Customs' classification of certain merchandise imported from August 3, 1988 to November 27, 1990. The imported items are referred to as "polyurethane shells" by Rollerblade and as "roller skate boots" by Customs. As discussed below, whether the items are roller skate boots (and thus are footwear) is critical to the outcome of this case.

Before January 1, 1989, Customs classified imported merchandise using the Tariff Schedules of the United States (TSUS). Customs classified the merchandise entered before January 1, 1989, as footwear under item 700.56, TSUS. The rate of duty for this classification was 6 percent *ad valorem.* Effective January 1, 1989, Customs began applying the Harmonized Tariff Schedule of the United States (HTSUS) instead. Customs classified the merchandise entered after January 1, 1989, as sports footwear under subheading 6402.19.10, HTSUS. The rate of duty for this classification was also 6 percent *ad valorem.*

Rollerblade claims that the proper classification for the merchandise entered before January 1, 1989, is under item 734.90, TSUS, which covers roller skates and parts thereof. Merchandise classified under this provision is free of duty. For the merchandise entered after January 1, 1989, Rollerblade asserts that the proper classification is roller skates and parts and accessories thereof under subheading 9506.70.20, HTSUS. Merchandise classified under this provision is also free of duty.

As the Court of International Trade noted, the merchandise at issue "consists of rigid, molded plastic (polyurethane) boots which include a removable, padded vinyl liner. The bottom portion of each boot is molded to accommodate the permanent attachment of wheel frames and wheels." Both parties agree that the merchandise is not imported with wheel frames or wheels. Instead, wheel frames and wheels are attached to the bottom of the boots after the boots are imported, resulting in the end product of in-line roller skate outfits. The merchandise cannot be used for any purpose other than as the boot component of in-line skates.

The parties agreed that there are no disputed issues of material fact and filed cross-motions for summary judgment. The Court of International Trade held that although the imported items *prima facie* fall under both provisions—"footwear" and "parts of roller skates"—the items must be classified as "parts of roller skates" because that provision more specifically describes the merchandise. The court also noted the "anomaly"

that would result if the court held otherwise—that a party importing a finished product with wheels, boots and all, incurs no duty liability, whereas a party assembling the wheels and boots in the United States, thereby creating domestic jobs, must pay duties.

## II

We review the grant of summary judgment for correctness as a matter of law. *Mita Copystar Am. v. United States,* 21 F.3d 1079, 1082 (Fed.Cir.1994). The meaning of a tariff classification term, being a question of law, is also reviewed *de novo. Totes, Inc. v. United States,* 69 F.3d 495, 497–98 (Fed.Cir. 1995). Determining whether the items at issue come within a particular tariff provision, as properly interpreted, is a question of fact. *Id.* at 498. Here, the parties filed cross-motions for summary judgment and agree that there are no disputed issues of material fact. They agree that none of the pertinent characteristics of the merchandise is in dispute, and thus the sole issue is a matter of properly interpreting the classification term at issue—footwear—to determine whether the scope of that term is broad enough to encompass the items with the particular characteristics.

This step of interpreting the relevant classification term, as noted above, is a question of law to be decided independently by this court, without deference to Customs' interpretation. Customs, however, argues that its classification decisions should be entitled to deference based on either the statutory presumption of correctness under 28 U.S.C. § 2639(a)(1) (1994) or the *Chevron* doctrine, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). We do not find either argument meritorious here, where the sole issue concerns the proper scope of a classification term.

First, as for the statutory presumption, § 2639(a)(1) states (emphasis added):

(a)(1) Except as provided in paragraph (2) of this subsection, in any civil action commenced in the Court of International Trade under section 515, 516, or 516A of the Tariff Act of 1930, the decision of the

Secretary of the Treasury, the administering authority, or the International Trade Commission is *presumed to be correct.* The burden of proving otherwise shall rest upon the party challenging such decision. Customs cites a Court of International Trade decision, *Commercial Aluminum Cookware Co. v. United States,* 938 F.Supp. 875, 880–81 (Ct. Int'l Trade 1996), and argues that Customs' classification decision is presumed to be correct as a whole, including purely legal portions of the decision. Customs' and the Court of International Trade's (in *Commercial Aluminum* ) interpretation of § 2639 is inconsistent with our precedent in *Goodman Manufacturing, L.P. v. United States,* 69 F.3d 505 (Fed.Cir.1995). There, we squarely held that the statutory presumption of correctness under § 2639 is irrelevant where there is no factual dispute between the parties. *Id.* at 508.

Moreover, the court's duty to decide independently the meaning of a classification term is statutorily mandated. Section 2643(b), title 28, provides (emphasis added):

§ 2643 Relief

. . . .

(b) If the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to *reach the correct decision.*

Congress mandated the Court of International Trade to determine the scope of the classification. The Court of International Trade's charter to "reach the correct decision" in classification cases would be subverted if Customs' interpretation of a classification term was given deference. Thus, the court must independently decide legal issues; the court cannot shirk its responsibility of deciding what a classification term means by simply saying the challenger failed to persuade the court that its interpretation is more "correct" than that of Customs. It would indeed be anomalous if two entries of identical merchandise imported by two separate importers were to be classified differently because the first importer made a "poor" legal argument, and the second importer made a "good" legal argument.

■ Customs' argument for deference based on *Chevron* similarly fails. We have specifically held that *Chevron* deference does not apply to routine classification cases. *Crystal Clear Indus. v. United States,* 44 F.3d 1001, 1003 n. * (Fed.Cir.1995). We also agree with the line of cases from the Court of International Trade that hold that the Court of International Trade's statutory mandate to find the correct result in a classification case is logically incompatible with *Chevron* deference. *See, e.g., Anval Nyby Powder AB v. United States,* 927 F.Supp. 463, 469 (Ct. Int'l Trade 1996); *Semperit Indus. Prods., Inc. v. United States,* 855 F.Supp. 1292, 1299–1300 (Ct. Int'l Trade 1994). We reiterate here that no *Chevron* deference applies to classification decisions by Customs.

In sum, no deference attaches to Customs' classification decisions either under 28 U.S.C. § 2639 or under *Chevron,* where there are no disputed issues of material fact.

### III

■ The sole dispositive issue in this case concerns whether the imported items—whose pertinent characteristics are not disputed—are footwear within the meaning of item 700.56, TSUS and subheading 6402.19.10, HTSUS. Of the 108 entries at issue, seven entered before January 1, 1989, and thus are subject to the TSUS, and 101 entered pursuant to the HTSUS. If the scope of the term footwear is *prima facie* broad enough to encompass the items at issue, then as discussed below in section IV, the TSUS, the HTSUS, and the accompanying notes mandate the items be classified as such and not as "parts of roller skates."

We begin with the language of the pertinent classification sections (emphasis added):

*700.56, TSUS*

*Footwear* (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics or over 50 percent by weight of fibers and rubber or plastics with at least 10 percent by weight being rubber or plastics:

Other footwear (except footwear having uppers of which over 50 percent of the exterior surface area is leather):

Having uppers of which over 90 percent of the exterior surface area is rubber or plastics (except footwear having foxing or a foxing-like band applied or molded at the sole and overlapping the upper):

. . . .

Other.

*6402, HTSUS*

Other footwear with outer soles and uppers of rubber or plastics: *Sports footwear:*

*6402.19.10, HTSUS*

Other:

Having uppers of which over 90 percent of the external surface area (including any accessories or reinforcements such as those mentioned in note 4(a) to this chapter) is rubber or plastics (except footwear having foxing or a foxing-like band applied or molded at the sole and overlapping the upper and except footwear designed to be worn over, or in lieu of other footwear as a protection against water, oil, grease or chemicals or cold or inclement weather).

In short, both the TSUS and the HTSUS provisions above cover footwear with particular characteristics (such as rubber or plastics content). The parties agree that those particular characteristics are not at issue—the only issue is whether the imported items qualify as footwear.

Although neither the TSUS nor the HTSUS provides a definition for footwear *per se*, the accompanying notes shed light as to the scope of the term. We begin with the TSUS headnotes for the subpart quoted above (emphasis added):

*Schedule 7, Tariff Schedules of the United States (TSUS):*

Part 1, Subpart A—Footwear

Subpart A headnotes:[1]

1. This subpart covers boots, shoes, slippers, sandals, moccasins, slipper socks (socks with applied soles of leather or other material), scuffs, overshoes, rubbers, arctics, galoshes, and all allied footwear (including athletic or sporting boots and shoes) *of whatever material composed, and by whatever method constructed,* all the foregoing *designed for human wear* except—

(i) footwear with permanently attached skates or snowshoes (see part 5D of this schedule),

(ii) hosiery (see part 6C of schedule 3), and

(iii) infants' knit footwear (see part 6F of schedule 3).

■ Thus, under TSUS, footwear is a broad term covering any wearing apparel for the human foot that is constructed by whatever method. *See Westminster Corp. v. United States,* 78 Cust.Ct. 22, 432 F.Supp. 1055, 1057 (1977) (stating that footwear is a form of wearing apparel for the feet). None of the enumerated exceptions (i)–(iii) above applies here. In particular, exception (i) does not apply because the items as imported have no attached skates.

■ Moreover, United States Tariff Commission, Summaries of Trade and Tariff Information (Summaries), Vol. 4, at 137 (1968), indicates that skating boots of the type at issue here were intended to be classified as footwear and not as roller skate parts (emphasis added): [2]

For both roller and ice skates, the term "skates" covers (1) the shoe type, i.e., skates permanently attached (riveted) to boots or shoes (such skates are referred to in this summary as "skate outfits"), (2) skates made to be permanently attached to

---

1. The headnotes in the TSUS "set forth rules of interpretation, define terms, express classification priorities, limit or modify the scope of particular provisions, and achieve other purposes." United States International Trade Commission, *Conversion of the Tariff Schedules of the United States Annotated into the Nomenclature Structure of the Harmonized System* 10 (1983).

2. Although not controlling, the Summaries are nonetheless instructive on the meaning of a tariff term. *See United States v. Standard Surplus Sales, Inc.,* 69 C.C.P.A. 34, 667 F.2d 1011, 1015 n. 4 (1981).

footwear, and (3) strap-on skates. Roller-skate outfits have plastic or wooden wheels, for use in indoor rinks, whereas strap-on skates usually have metal wheels suitable for use on sidewalks. Almost all of the ice skates sold in the United States have been skate outfits. The only strap-on ice skates sold in recent years have been negligible quantities of sled-like skates for small children. *Parts for ice and roller skates consist chiefly of plates, blades, and wheels.* The trade in parts is insignificant. (*Shoes are classified under schedule 7 of the TSUS rather than as skate parts, even if of a type used for attachment to skates* ).

Thus, Congress set forth a relatively simple and straight-forward classification system for roller skates and roller skate parts: a roller skate outfit may be comprised of top and bottom portions, where the top portion, regardless of the particular characteristics thereof, is called the boot (or the shoe) and the bottom portion is called the skate. The Summaries also make it clear that "parts of roller skates" were meant to cover the parts of the skates (such as plates, blades, and wheels), and not the boot. Thus, when a boot (without attached skates) intended for use in the manufacture of the roller skate outfit is imported, it is classified as footwear. However, when the boot is attached to the skate, the entire roller skate outfit, including the boot, is classified as a roller skate. Classifying the entire roller skate outfit as a roller skate was intended to eliminate Customs' unnecessary work in separately apportioning the value of the boot and the skate. *See* United States Tariff Commission, *Tariff Classification Study*, Schedule 7, at 285 (1960).

■ As for the HTSUS, the Explanatory Notes to chapter 64, HTSUS, indicate the broad scope of the term footwear (emphasis added):[3]

> [w]ith certain exceptions ... this Chapter covers ... various types of footwear ... *irrespective of* their *shape* and *size*, the particular *use* for which they are designed,

their *method of manufacture* or the *materials* of which they are made.

In light of the similarity of the language of the "footwear" provisions under the two Tariff Schedules and accompanying notes and the lack of any legislative history to the contrary, we construe the term "footwear" under the HTSUS to cover the articles of the type at issue. That is, the "footwear" provision under the HTSUS encompasses shoes of the type used for attachment to skates, while the "roller skate parts" provision covers plates, blades and wheels.

Rollerblade raises several arguments as to why the imported items are not footwear: (1) the imported items at issue are neither usable nor marketable as wearable footwear in their condition as imported; (2) the items are unsuitable for normal walking; (3) the items derive their essential character from something other than the part that covers the foot, *i.e.,* from the contour of the bottom portion of the shell, which is specially designed to accommodate the permanent attachment of wheel frames during the manufacture of in-line roller skates; and (4) the term "skating boots" in the Schedules refers to the early forms of roller and ice skating boots that could be worn both for skating and as normal street shoes. Rather than elaborating on each of Rollerblade's arguments, we simply note that none of these arguments finds basis in, or is consistent with, the Tariff Schedules or any discernible legislative intent.

## IV

■ Having determined that the items at issue are *prima facie* footwear, we now turn to the issue of whether they must be classified as such or as "parts of roller skates" as argued by Rollerblade. *See Jarvis Clark Co. v. United States,* 733 F.2d 873, 876 (Fed.Cir. 1984) ("The tariff schedules are so structured that many articles could fall under several different classifications, while others do not fit any classification perfectly."). The answer to that question is found in the Tariff Schedules themselves and the accompanying

---

**3.** While the Explanatory Notes do not constitute controlling legislative history, they are nonetheless intended to clarify the scope of HTSUS sub-headings and to offer guidance in interpreting its subheadings. *Mita Copystar,* 21 F.3d at 1082.

notes. We begin with item 734.90 of the TSUS (emphasis added):

*734.90, TSUS*

*Skates (including footwear with skates permanently attached), and parts thereof:*

Roller skates, and parts thereof.

*Part 5, Subpart D—Games and Sporting Goods* [TSUS] Subpart D headnotes:

1. This subpart covers equipment designed for indoor or outdoor games, sports, gymnastics, or athletics, *but does not cover—*

. . . .

(ii) *footwear, other than footwear with skates permanently attached* (see part 1A of this schedule);

Accordingly, roller skate boots (without skates attached), being footwear, are specifically excluded from the "roller skate parts" provision.

Similarly, the HTSUS and the accompanying notes exclude the roller skate boots (without skates attached) from the "roller skate parts" provision (emphasis added):

*9506, HTSUS*

Articles and equipment for gymnastics, athletics, other sports (including table-tennis) or outdoor games, not specified or included elsewhere in this chapter; swimming pools and wading pools; parts and accessories thereof:

*9506.70, HTSUS*

Ice skates and *roller skates, including skating boots with skates attached;* parts and accessories thereof:

*9506.70.20, HTSUS*

Roller skates and parts and accessories thereof.

*Chapter 95, Harmonized Tariff Schedule of the United States:*

Notes

1. This chapter *does not cover:*

. . . .

(g) *Sports footwear (other than skating boots with ice or roller skates attached)* of chapter 64, or sports headgear of chapter 65 . . .

Despite the clear language of the Schedules and the attached notes, the Court of International Trade found that the imported items belonged to the "roller skate parts" provision, explaining (sentence numbering added):

[1] In fact, the provisions which the [Government] cites demonstrate the correctness of [Rollerblade's] claim that the merchandise is a part of a roller skate. [2] The plain language of the tariff schedule exclusion refers to "boots" or "footwear . . . with skates attached." [3] If the merchandise excluded from the footwear classification includes the boot, then the boot is a part of the excluded product. [4] The imported merchandise at issue here forms an integral part of the final roller skate. [5] Therefore, it is excluded from the footwear classification.

The Court of International Trade's error began with sentence 3 above. While it is true that the boot *is* a part of a tariff-free product (*i.e.,* the roller skate outfit), that does not mean that the boot itself is tariff-free. That logic is analogous to stating that an automobile tire is tariff-free if an automobile is tariff-free. An item must be evaluated for tariff purposes in its condition as imported. *Simod Am. Corp. v. United States,* 872 F.2d 1572, 1577 (Fed.Cir.1989).

However, we are, as the Court of International Trade apparently was, sympathetic with Rollerblade's situation. Imposing tariffs on the in-line roller skate boots while not imposing tariffs on the finished in-line roller skate outfits puts companies like Rollerblade, who import the boots and assemble the outfits in the United States, at a competitive disadvantage relative to those who import finished roller skate outfits. This odd phenomenon is referred to as tariff inversion and was recognized by Congress itself. Senate Report No. 101–252, at 31 states:

Section 1412. Certain in-line roller skate boots

Roller skates consist of boots with skates attached. These are imported, mostly from Taiwan, as "sports equipment," HTS subheading 9506.70.20, free of duty. A U.S. company currently manufactures skates and attaches them to boots, but in

doing so it finds itself at a commercial disadvantage because boots without skates attached are classified as sports footwear with outer soles and uppers of rubber or plastics under HTS 6402.19.10, subject to a duty of 6 percent *ad valorem*. This phenomenon, known as tariff inversion, puts the U.S. production of components at risk. Therefore, the Committee approved a temporary suspension of the duty on boots without skates attached, provided the boots are actually used in the manufacture of roller skates.

S.Rep.No. 101–252, at 31 (1990), *reprinted in* 1990 U.S.C.C.A.N. 928, 958. Thus, Congress noted the tariff inversion problem and rectified it by enacting a temporary suspension of the duty on boots without skates attached. However, in doing so, Congress considered suspending the duty retroactive to April 30, 1986, but chose not to.[4] The items at issue entered before the effective date of the 1990 "temporary suspension" act. Under these circumstances where the meaning of the classification term is clear, we must enforce the classification system as written by Congress—however anomalous the tariff inversion may seem, even to Congress itself.

## V

The imported items are footwear and must be classified as such under item 700.56, TSUS, and subheading 6402.19.10, HTSUS, not as parts of roller skates under item 734.90, TSUS, and subheading 9506.70.20, HTSUS. Accordingly, the judgment of the Court of International Trade is hereby reversed.

*REVERSED.*

---

4. The action was described in the conference report as follows (emphasis added):

In-line roller skate boots (section 430 of House bill; section 1412 of Senate amendment; section 429 of conference agreement)
*Present Law*
Imports of boots actually used in the manufacture of in-line roller skates enter under HTS subheading 6402.19.10 with a column 1 general rate of duty of 6 percent ad valorem.
*House Bill*

Suspends the column 1 general rate of duty for item 6402.19.10 through December 31, 1992.
*Senate Amendment*
*Identical provision, except for additional retroactive duty-free treatment to April 30, 1986.*
*Conference Agreement*
*The Senate recedes.*
136 Cong.Rec. H5946 (daily ed. July 30, 1990) (joint explanatory statement of the committee of conference).