**TEXPORT OIL COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Slip Op. 98–21.**
**Court Nos. 94–02–00088, 94–06–00362.**

United States Court of
International Trade.

March 5, 1998.

Barnes, Richardson & Colburn (Rufus E. Jarman, Jr. and Christopher E. Pey), for plaintiff.

Frank W. Hunger, Asst. Atty. Gen.; David M. Cohen, Director, Jeanne E. Davidson, Asst. Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (John Warshawsky), for defendant.

## OPINION

MUSGRAVE, Senior Judge.

Plaintiff, Texport Oil Company ("Texport"), brought this action to contest the denial of duty drawback claims of petroleum products by defendant, the United States Customs Service ("Customs"). Texport contends that the merchandise involved was commercially interchangeable. Customs denied the drawback claims based on incomplete and inconsistent testing of some import and export shipments. Texport provided evidence that the sales contracts involved in the drawback claims were commercially accepted by both parties for the same merchandise. Where parties have agreed at arm's length on the described merchandise, the Court finds that there is commercial acceptance. When the commercially accepted imported merchandise matches the commercially accepted exported merchandise, the Court finds that the two are commercially interchangeable for drawback purposes for the reasons that follow.

### Background

Texport was established in 1987 as a petroleum product marketing company and ceased operations in 1994. Texport traded petroleum products both internationally and domestically and Texport contests Customs' denial of duty drawbacks associated with a number of trades made on exports between September, 1990 and May, 1991. Pursuant to the "substitution same condition drawback" under 19 U.S.C. § 1313(j)(2), Texport filed notices of export with Customs several days before the export shipments requesting accelerated payment of duty drawback before final liquidation of the drawback entries. Customs subsequently granted the request and approximately $1,000,000 in duty drawback was paid under the accelerated drawback program. Customs developed the accelerated drawback program to speed the recovery of refundable duties paid by " 'claimants not delinquent or otherwise remiss in their transaction with Customs' who demonstrate satisfactory recordkeeping procedures." Pl.'s Post Trial Br. ("Pl.'s Br.") at 9. Texport's drawback claims indicated that

the merchandise exported was "fungible" with the imported merchandise consistent with 19 U.S.C. § 1313(j). Customs examined the exports shipped on the vessels *Boris, Al Deerah, Viking Venture* and the two exports on the *Team Erviken* and found that the merchandise exported on these shipments was "in the same condition as imported, or changed in condition as allowed by law." Pl.'s Br. at 10.

However, Customs later denied the duty drawback claim associated with the export shipment aboard the *Boris,* and in denying Texport's subsequent protest, Customs denied all the other Texport drawback claims that had not been finally liquidated as of November 5, 1993. Customs then issued bills to Texport for the return of the refunded accelerated duty drawback amounts. Texport filed a summons with the Court on February 4, 1994 (Court No. 94–02–00088) and also filed a protest with Customs regarding the seventeen non-*Boris* drawback claims that were denied. The February 4, 1994 protest was also denied in part by Customs on the grounds that the import and export merchandise was not commercially interchangeable as required by the drawback statute. Texport then filed its summons in Court No. 94–06–00362 on June 24, 1994. Court No. 94–02–00088 and Court No. 94–06–00362 were treated jointly for the purposes of trial by the order dated December 5, 1996 and now consist of the drawback claims that were not settled at or before trial. The Court held the first portion of the bifurcated trial on April 2–3, 1997 and the final segment on May 14, 1997.

### Standard of Review

■ Under 28 U.S.C. § 2639(a)(1), Customs' decision is "presumed to be correct" and the "burden of proving otherwise shall rest upon the party challenging such decision."[1] However, the Court of Appeals for Federal Circuit ("CAFC") has found that the presumption of correctness applies solely to factual questions and that this Court's duty is to find the correct result. The duty of the Court to find the correct result stems from both legislative and judicial sources. The CAFC recently found that "the trial court ... must consider whether the government's classification is correct, both independently and in comparison with the importer's alternative.... [T]he court's duty is to find the correct result, by whatever procedure is best suited to the case at hand." *Jarvis Clark Co. v. United States,* 2 Fed. Cir. (T) 70, 75, 733 F.2d 873, 878 (1984). Pursuant to the statute, "[i]f the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision." 28 U.S.C. § 2643(b).[2]

### Discussion

This case concerns denial of certain duty drawback claims filed by Texport. The drawback claims concern specific import and export shipments of petroleum products. Customs finally denied Texport's drawback claims based on the finding that the imported merchandise was not commercially interchangeable with the exported merchandise. Texport provided evidence at trial that the petroleum products were commercially interchangeable based on acceptance of the buyer, thereby proving that commercial parties accepted the import merchandise as commercially interchangeable with the export merchandise. The Court finds that the practicable standard for commercial interchangeability is the acceptance of the buyer in an arm's length transaction of the listed product on the import invoice with the listed product on the export invoice.

---

1. 28 U.S.C. § 2639(a)(1) (1994).

2. *See Goodman Mfg., L.P. v. United States,* 13 Fed. Cir. (T) ——, ——, 69 F.3d 505, 508 (1995) (the statutory presumption of correctness attaches only to an agency's factual determinations) *and Rollerblade, Inc. v. United States,* 15 Fed. Cir. (T) ——, 112 F.3d 481 (1997) (legal issues are not afforded deference under 28 U.S.C. § 2639 or under the administrative deference standard promulgated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

Texport also requests the Court to grant refund of the merchandise processing fees ("MPFs") and harbor maintenance tax ("HMT") fees that were paid for the corresponding import duties which are the subject of the duty drawback claims at issue. Customs argues that Texport has failed to exhaust its administrative remedies which precludes the Court from jurisdiction. Customs also contends that even if the Court had jurisdiction, the MPFs and HMT fees are not amenable to the drawback statute. The Court finds that it has jurisdiction and that MPFs and HMT can be claimed for drawback under the statute for the reasons that follow.

## I. Applicable Standard

The resolution of the core issue focuses on the applicable standard of the terms "commercially interchangeable" contained in the same condition duty drawback statute. Under the former provision for duty drawback, "fungibility" was the standard but both parties have agreed that the revised statute that uses "commercially interchangeable" standard controls in this case. Def.'s Post Trial Br. ("Def.'s Br.") at 6 and Pl.'s Br. at 16–27. The drawback provision's purpose is to rebate those duties, taxes or fees that were paid on importation when commercially interchangeable substitutes are exported within a three year period. 19 U.S.C. § 1313(j)(2) (1994). Therefore, imported merchandise that is either destroyed or subsequently exported is exempted from duties, taxes and fees ostensibly because it never enters the stream of U.S. commerce. The relevant sections of the drawback statute provide:

(j) **Unused merchandise drawback**

\* \* \*

(2) Subject to paragraph (4), if there is, with respect to imported merchandise on which was paid any duty, tax, or fee imposed under Federal law because of its importation, any other merchandise (whether imported or domestic), that—

(A) is commercially interchangeable with such imported merchandise;

\* \* \*

· then upon the exportation or destruction of such other merchandise the amount of each such duty, tax, and fee paid regarding the imported merchandise shall be refunded as drawback, but in no case may the total drawback on the imported merchandise, whether available under this paragraph or any other provision of law or any combination thereof, exceed 99 percent of that duty, tax, or fee.

19 U.S.C. § 1313(j)(2) (1994). Thus, the drawbacks of duties, taxes or fees that were assessed upon importation will be made upon the exportation of commercially interchangeable merchandise.

Customs argues that proof of commercial interchangeability would require the satisfaction of a test "gauged by objective quality-oriented standards, *e.g.*, standards established by industry-wide organizations such as the American Society for Testing and Materials ("ASTM")." Def.'s Br. at 5. Customs points to the trial testimony of Texport's witnesses who stated that they would "assume the business risks created by accepting incomplete test results for the purposes of its trading activities." *Id.* Customs' witnesses focused on the need to conduct complete tests of the physical properties of the imported and exported merchandise based on the ASTM standard to prove commercial interchangeability. *Id.* at 5–6.

Texport, conversely, appeals to the Court to grant the drawback claims based on a number of arguments. First, Texport claims that the testing, albeit incomplete and not within strict limits of the ASTM standards in some cases, conducted on the subject merchandise, provide ample evidence that the imported goods were commercially interchangeable. Pl.'s Br. at 49–54. Texport maintains that the "critical properties of the products identified to these claims were all within the appropriate limits of the applicable specifications." *Id.* at 50. The Court notes the debate of the meaning of "critical properties," as Customs objected to incomplete testing of some shipments as required by the ASTM standards.

Texport also introduced evidence that the "import and export shipments were classified

in the same tariff heading" providing further proof that the import and export shipments were commercially interchangeable. *Id.* at 52. Texport further asserts that commercial interchangeability is proved by the buyer's acceptance of good delivery. *Id.* at 53. Texport forwarded the proposition that "the determination of [commercial interchangeability] in this case may be made on the basis of actual sales made to actual commercial purchasers in the ordinary course of business." *Id.* Texport contends that all of the shipments were accepted by the buyers and that Texport received no subsequent claims from the buyers that would have indicated that the merchandise was something other than what was paid for. Finally, Texport provided evidence that the commercial documents kept in the ordinary course of business listed the same imported and exported merchandise. *Id.* at 54.

■ The Court finds that the "commercially interchangeable" standard was devised to allow market forces to determine whether merchandise is equivalent in the context of the duty drawback statute. The legislative history specifically contemplates the aid of "recognized industrial standards" in the determination of commercial interchangeability. *See* H.R.Rep. No. 103–361, at 130–132 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2552 at 2680–82. Absent an acceptable test based on the applicable standard,[3] Customs should measure commercial interchangeability under the duty drawback setting based on the comparison between the description of the imported merchandise on the contract or invoice and the description of the exported merchandise on the contract or invoice. Where parties have agreed at arm's length on the described merchandise, the Court finds that there is commercial acceptance. The Court finds that commercial interchangeability, for drawback purposes, is determined by a two-part inquiry: first, the imported and exported merchandise must be commercially accepted; and second, the description of the imported and exported merchandise must match on the sale invoice or contract.

The Court has adopted this standard based on commercial practicability and market reality, since buyers and sellers are reluctant to expend time and resources on testing that does not further their interests. In a number of the petroleum shipments reviewed by the Court, Customs indicated that further tests needed to be performed on the subject merchandise before duty drawback was granted. However, the Court understands that some merchandise has an acceptable indicia of authenticity such as jet fuel issuing from a commercial pipeline with the strictest standards in the industry. The Court finds no basis for concluding that jet fuel emanating from a reliable source such as the Colonial Pipeline is not suitable for use as Jet Fuel A, under the ASTM standard. Pl.'s Br. at 56. In some shipments of petroleum products, Customs has required testing to be performed on merchandise that was no longer titled to Texport. The Court finds that once transfer of title has taken place, the subject merchandise is no longer in control of the seller and falls outside of the purview of Customs' inquiry into commercial interchangeability, absent some subsequent non-acceptance by the consignor.

■ The Court's "commercially interchangeable" standard, based on commercial acceptance, has its limitations; when the description of the imported merchandise differs from the description of the exported merchandise, even when the subject merchandise is identical, commercial interchangeability fails. Simply put, when the description of imported merchandise does not match the description of the exported merchandise or when the subject merchandise does not satisfy an acceptable test based on the applicable standard, duty drawback claims shall be denied. For example, Texport filed a drawback claim for the importation of jet fuel and the exportation of heating oil. Texport claims that the heating oil exported possessed the "critical" properties of jet fuel and was, therefore, commercially interchangeable. Although both the import and export shipments were commercially accepted, the merchan-

---

**3.** Where Texport's drawback claims have satisfied the testing under the applicable ASTM standard, Customs has accepted them.

dise agreed to on importation differed from the merchandise agreed to on exportation and was not tested as jet fuel and is consequently not commercially interchangeable, even though the merchandise may well have been identical. Using this standard, the Court will discuss the drawback claims that Texport has contested.

### A. The *Boris* Claim

■ Texport exported what it claims was "Jet Fuel A" under the ASTM D1655 standard aboard the vessel *Boris*. Texport's duty drawback claim on this export shipment was denied by Customs based on the "absence of testing for contamination beyond the storage tank" and the "introduction of conductivity improver into the fuel prior to exportation." Def.'s Br. at 11. The import shipments that were involved in this duty drawback claim were not at issue. Typical export shipments are made from shore tanks to the vessel and conductivity improver is added at some point during the vessel's loading to reduce the risk of explosion during the voyage.

Employing the Court's commercial acceptance standard, the *Boris* export shipment was accepted by the buyer as Jet Fuel A, the same merchandise that was imported on the duty drawback claim, and therefore qualifies for commercial interchangeability. Customs' claims that the jet fuel was not tested beyond the shore tanks and that conductivity improver was added once the jet fuel left the control of Texport. Customs' arguments ignore commercial reality and the accepted industry norms. The buyer of the jet fuel accepted the shipment based on the testing performed at the shore tanks. The pipeline that carried the jet fuel from the shore tanks to the *Boris* was understood by both buyer and seller, as is the customary practice, not to introduce any impurities. Once the jet fuel reaches the end of the pipeline leading away from the shore tanks, the Court finds that seller no longer holds title. Beyond this point, the jet fuel is out of Customs' province of inquiry into commercial interchangeability. It is clear to the Court that the conductivity improver was added after this point by the buyer while under proper title of the buyer.

The Court finds that the *Boris* export shipment fulfills the tests for commercial interchangeability. Customs' denial of the duty drawback claim is rejected and Texport's claim is granted.

### B. The *Al Deerah* Claim

■ Texport exported what it claims was Jet Fuel A aboard the vessel *Al Deerah.* Texport's duty drawback claim was denied by Customs on the basis that the tests performed immediately prior to the export shipment were heating oil tests, not jet fuel tests. The corresponding import shipments were not disputed by Customs. Texport contends that the jet fuel loaded from the shore tanks was shipped via the Colonial Pipeline, which is "one of the purest sources of jet fuel available" and is subject to frequent testing and exceeds standard tests for jet fuel. Pl.'s Br. at 56. The Court finds that the requisite standard for jet fuel would be met if accepted by the buyer, since it is apparent that the jet fuel imported was the same merchandise that was exported. However, the contract for sale lists the merchandise as "stove oil" which would fail the second prong of the Court's test. Since the described merchandise on the contracts differed between the import shipments and the export shipment, Customs correctly denied the *Al Deerah* export shipment duty drawback claim.

### C. The *Viking Venture* Claim

■ Texport exported what it claims was Jet Fuel A aboard the vessel *Viking Venture.* Customs denied Texport's duty drawback claim based on "the absence of testing for contamination beyond the storage tank." Def.'s Br. at 12. Customs did not contest the corresponding import shipments on the duty drawback claim. Similar to the *Boris* export shipment, Customs requested that Texport conduct tests on the jet fuel when it no longer held proper title. It is clear from the four tests performed at the shore tanks that the buyer was satisfied that the export shipment was acceptable Jet Fuel A as reflected on the export contract. The Court finds that the *Viking Venture* export shipment of Jet Fuel A was commercially accepted and complies with the standard for commercial inter-

changeability. The Court finds that Customs denial of the *Viking Venture* export duty drawback claim was erroneous.

### D. The *Team Troma* Claim

Texport exported a shipment of what is agreed to have been Jet Fuel A aboard the vessel *Team Troma.* Customs, however, denied the duty drawback claim based on this export shipment claiming that the corresponding import shipments were not commercially interchangeable. Specifically, Customs contends that the import shipment aboard the *Torm Venture* was not tested for thermal stability. Def.'s Br. at 12. Applying the Court's analysis, it is clear that Texport accepted the import shipment as Jet Fuel A, as evidenced by the purchase contract, and the description of the import shipments matches the export shipment proving commercial interchangeability. The Court finds that Customs' denial of Texport's duty drawback claim was incorrect.

### E. The *Pols Robson* Claim

Texport exported what it claims was Jet Fuel A aboard the vessel *Pols Robson.* Customs denied Texport's duty drawback claim on this export based on the omissions of test results on both the export shipment and the import shipment aboard the *Torm Venture.* Customs contends that the tests done at the shore tanks and aboard the *Pols Robson* omitted the majority of critical tests for contamination. Def.'s Br. at 13. Texport provided evidence that all of the import shipments, as well as the export shipment aboard the *Pols Robson,* were bought and sold as Jet Fuel A and accepted by all parties. Because the jet fuel was commercially accepted and the description of the merchandise of the import shipments matched that of the export shipment, the Court finds that the merchandise was commercially interchangeable and the denial of the duty drawback claim was erroneous.

### F. The *Irving Eskimo* Claim

Texport exported what it claims was Jet Fuel A aboard the vessel *Irving Eskimo.* Customs denied Texport's duty drawback claim based on unacceptable testing methods on the import shipments aboard the vessels *Bhawani* and *Ambia Fair* as well as the export shipment aboard the *Irving Eskimo.* Specifically, Customs cited that the "Bhawani import shipment test results had been obtained at the refinery, the Ambia Fair import shipment had incomplete ship test results, and the Irving Eskimo export shipment was tested only in the shore tank." Def.'s Br. at 13. Again, Texport provided evidence that the jet fuel was commercially accepted for both the import and the export shipments. The Court finds that Texport provided the two requisites for commercial interchangeability: commercial acceptance on both the import and export shipments as well as documentation showing matching merchandise descriptions on the contracts. The Court finds that Customs' denial of Texport's duty drawback claim for the export shipment aboard the *Irving Eskimo* was erroneous.

### G. The *Team Erviken* Claim

Texport exported two shipments of what has been agreed was heating oil aboard the vessel *Team Erviken.* Customs, however, denied Texport's duty drawback claims based on the incomplete testing performed on the corresponding import shipments aboard the vessels *Patricia* and *Turmoil.* It is clear from the evidence that both import shipments were commercially accepted by Texport as being heating oil. Further, the *Team Erviken* export was commercially accepted by the buyer as heating oil. The Court finds that the two export shipments of heating oil aboard the *Team Erviken* were commercially interchangeable with the import shipments and entitled to duty drawback under the statute.

### H. The *Nordic* Claim

Texport exported what it claims was gasoline aboard the vessel *Nordic.* Customs denied Texport's duty drawback claim based on the incomplete test results conducted on the export shipment and the inconsistent test results on the import shipment aboard vessel *Boris.* Def.'s Br. at 15. The Court is satisfied that both the import and export shipments were commercially accepted as gasoline by the evidence presented. Tex-

port's import and export shipments are found by the Court to be commercially interchangeable and amenable to duty drawback claims under the statute.

## II. Merchandise Processing Fees and Harbor Maintenance Tax Fees

■ In its amended complaint, Texport requested the Court to grant the drawback of the MPFs and HMT fees that correspond to the duty drawback claims at issue. As a threshold issue, Customs maintains that the Court lacks the jurisdiction over the fee drawback claims since Texport failed to protest them before Customs. Customs argues that Texport has failed to exhaust its administrative remedies required and, therefore, "plainly cannot satisfy the requirements for subject matter jurisdiction, pursuant to 28 U.S.C. § 1581(a)." Def.'s Br. at 2. Texport countered by stating that their protests were broad enough to encompass the inclusion of the MPFs and HMT fees. Even if specific reference to the drawback of MPFs and HMT fees was lacking in the protests, Texport argues that it would be futile to argue an issue which Customs has repeatedly denied. Customs' treatment of fee and tax drawbacks, Texport contends, would provide a jurisdictional hook.

The Court finds that Texport's drawback claims concerning the MPFs and HMT fees are properly before it. First, Texport's original protests requested drawback pursuant to 19 U.S.C. § 1313(j) and "19 U.S.C. § 1313(j)(2) or otherwise." Pl.'s Br. at 81. The statute specifically names the drawback of fees and taxes stating that upon the exportation of commercially interchangeable merchandise the "amount of each such duty, tax, and fee paid regarding the imported merchandise shall be refunded as drawback." 19 U.S.C. § 1313(j)(2) (1994). Although Texport did not specifically request the drawback of the MPFs and the HMT fees in either their initial protest or complaint, the Court finds that Texport's utilization of 19 U.S.C. § 1313(j)(2) properly incorporates the drawback of fees and taxes.

■ Second, the Court finds that claims of drawback of MPFs and HMT fees necessarily rest on the duty drawback paid on the merchandise at issue. When the underlying duty drawback claim is denied by Customs, the foundation for drawback on fees and taxes is completely eroded and fee and tax drawback claims fundamentally fail. Fee and tax drawback claims cannot stand on their own; fee and tax drawbacks need the basis provided by duty drawback claims involving the actual merchandise at issue. The effect is that once Texport's underlying duty drawback claim was denied by Customs, their corresponding fee or tax drawback claim was extinguished. Texport was therefore unable to protest the MPF and HMT fee drawback before Customs as a result of the duty drawback denial. Customs' denial of Texport's duty drawback claims was effectively a denial of its MPF and HMT fee drawback claim. For this reason, the Court finds that Customs' denial of the underlying duty drawback claim enables Texport to bring their MPF and HMT fee claim before the Court.

■ Addressing the substantive issue of the amenability of the MPFs and HMT fees to drawback, the Court finds that the drawback of fees and taxes paid on commercially interchangeable merchandise is acceptable under the statute. As mentioned above, the statute specifies drawback for taxes and fees:

(j) **Unused merchandise drawback**

\* \* \*

(2) Subject to paragraph (4), if there is, with respect to imported merchandise on which was paid any duty, tax, or fee imposed under Federal law because of its importation, any other merchandise (whether imported or domestic), that—

(A) is commercially interchangeable with such imported merchandise;

\* \* \*

then upon the exportation or destruction of such other merchandise the *amount of each such duty, tax, and fee paid regarding the imported merchandise shall be refunded as drawback,* but in no case may the total drawback on the imported merchandise, whether available under this paragraph or any other provision of law or

any combination thereof, exceed 99 percent of that duty, tax, or fee.

19 U.S.C. § 1313(j)(2) (1994) (emphasis added). The MPF is a fee that is assessed on all imports in the amount of 0.17 percent *ad valorem* for the processing by Customs pursuant to 19 U.S.C. § 58c (1990). As Texport argues, "[t]he fee shall be due and payable to Customs by the importer of record of the merchandise at the time of deposit of estimated duties." Pl.'s Br. at 77 (*citing* 19 C.F.R. § 24.23(c) (1990)). The Court agrees with Texport's statement that, as the importer of record, they were required to pay the MPF in order to enter the goods into the U.S., and as such, the MPF was "imposed under Federal law because of [the] importation [of the subject merchandise]" as required by the drawback statute.

Similarly, the HMT fee complies with the drawback statute. Under 26 U.S.C. § 4461, a tax of .125 percent [4] *ad valorem* is assessed on imported merchandise. Texport was liable, as the importer of record, for payment of the tax based on the value of the imported petroleum products at issue. The Court agrees with Texport's statement that "the HMT is in reality a tax 'imposed [upon the imported goods] under Federal law because of [their] importation.'" Pl.'s Br. at 80–81. The Court finds that the HMT fee is amenable to drawback as contemplated by the statute.

Customs contends that the HMT fee is assessed "because of the costs associated with port usage, . . . and the port's usage is not diminished when an importer subsequently exports commercially interchangeable merchandise." Def.'s Br. at 3. Customs makes the same argument for the MPFs and adds that MPFs are "costs for providing services with regard to the imported product [and] are not diminished when the shipper subsequently exports a commercially interchangeable product." *Id.* at 4. While the Court recognizes the logic of Customs' contentions, the drawback statute directs otherwise. The importer of record is entitled to drawback up to ninety-nine percent of the import duties, taxes and fees paid. The Court finds that Texport's MPF and HMT

fee drawback claims that are commercially interchangeable shall be granted.

### *Conclusion*

For the foregoing reasons, the Court finds that Texport's drawback claims that were found to be commercially interchangeable are granted. The Court finds that Texport's export shipments aboard the vessels *Boris, Viking Venture, Team Troma, Pols Robson, Irving Eskimo, Team Erviken* and *Nordic* are commercially interchangeable with their corresponding import shipments and therefore entitled to duty drawback. The same export shipments are also entitled to drawback of MPFs and HMT fees paid. Finally, the Court finds that the export shipment aboard the vessel *Al Deerah* is not commercially interchangeable with its corresponding import shipments and is not entitled to any drawback claims.

### JUDGMENT

Upon consideration of plaintiffs' post trial brief, defendant's post trial brief, trial and all other papers and proceedings, it is hereby

**ORDERED** and the plaintiffs' export shipments aboard the vessels *Boris, Viking Venture, Team Troma, Pols Robson, Irving Eskimo, Team Erviken* and *Nordic* are commercially interchangeable with their corresponding import shipments and therefore entitled to duty drawback; and it is further

**ORDERED** that the same export shipments are also entitled to drawback of MPFs and HMT fees paid; and it is further

**ORDERED** that the export shipment aboard the vessel *Al Deerah* is not commercially interchangeable with its corresponding import shipments and is not entitled to any drawback claims.

---

4. Before April 1, 1991, the tax was assessed at .04 percent *ad valorem*.