Slip Op. 03-117

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

_____

|  |  |  |
|---|---|---|
| RESER'S FINE FOODS, INC., | : | |
| D/B/A SIDARI'S ITALIAN FOODS, | : | |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| v. | : | COURT NO. 00-00021 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| DEFENDANT. | : | |

_____:

[Plaintiff's motion for summary judgment denied; Defendant's cross-motion for summary judgment denied.]

Dated: September 5, 2003

*Fitch, King and Caffentzis* (*James Caffentzis*), for plaintiff Reser's Fine Foods, Inc., d/b/a Sidari's Italian Foods.

*Robert D. McCallum, Jr.*, Assistant Attorney General, Civil Division, United States Department of Justice; *John J. Mahon*, Acting Attorney in Charge, International Trade Field Office (*Mikki Graves Walser*); Michael W. Heydrich, Office of the Assistant Chief Counsel, United States Bureau of Customs and Border Protection, of counsel, for defendant United States.

OPINION

EATON, *Judge*: Before the court are cross-motions for summary judgment pursuant to USCIT R. 56. By its motion Reser's Fine Foods, Inc., d/b/a Sidari's Italian Foods ("Plaintiff") challenges the United States Customs Service's ("Customs")[1] classification of certain entries of merchandise

---

[1] Effective March 1, 2003, the United States Customs Service was renamed the United States Bureau of Customs and Border Protection. *See* Reorganization Plan Modification

(continued...)

as "Other vegetables prepared or preserved otherwise than by vinegar or acetic acid, not frozen,

other than products of heading 2006 . . . Other vegetables and mixtures of vegetables . . .

Artichokes," under subheading 2005.90.80 of the Harmonized Tariff Schedule of the United

States ("HTSUS") (1998) and subject to a tariff rate of 15.8 percent *ad valorum*.  Plaintiff argues

that the merchandise is properly classifiable under HTSUS subheading 0711.90.60 as

"Vegetables provisionally preserved (for example, by sulfur dioxide gas, in brine, in sulfur water

or in other preservative solutions), but unsuitable in that state for immediate consumption . . .

Other vegetables; mixtures of vegetables . . . Other vegetables; mixtures of vegetables," subject

to a tariff rate of 9.1 percent *ad valorum*.  By its cross-motion the United States ("Government"),

on behalf of Customs, maintains that the merchandise is properly classifiable under HTSUS

subheading 2005.90.80 and asks the court to deny Plaintiff's motion and dismiss this action.  The

court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (2000).  Where jurisdiction is predicated

on 28 U.S.C. § 1581(a), Customs's interpretation of an HTSUS tariff term, a question of law, is

subject to *de novo* review.  *See* 28 U.S.C. § 2640; *E.T. Horn Co. v. United States*, 27 C.I.T. __,

__, Slip Op. 03-20 at 4 (Feb. 27, 2003) (quoting *Clarendon Mktg., Inc. v. United States*, 144 F.3d

1464, 1466 (Fed. Cir. 1998)).

        This court may resolve a classification issue by means of summary judgment.  *See Bausch

& Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998).  Summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

        [1](...continued)
for the Dep't of Homeland Security, H.R. Doc. 108-32, at 4 (2003).

together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ." USCIT R. 56(c). Summary judgment of a classification issue "is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is." *Bausch & Lomb*, 148 F.3d at 1365 (citing *Nissho Iwai Am. Corp. v. United States*, 143 F.3d 1470, 1472 (Fed. Cir. 1998); *IKO Indus., Ltd. v. United States*, 105 F.3d 624, 626–27 (Fed. Cir. 1997); *Rollerblade, Inc. v. United States*, 112 F.3d 481, 483 (Fed. Cir. 1997); *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1391 (Fed. Cir. 1994)). Here, the parties are in agreement that: (1) "[t]he merchandise . . . was imported from Spain [and] consists of 88-1/5 ounces of quartered artichoke hearts in a solution of water and acetic acid (0.1%), salt (1.2%) and citric acid (0.6%) packaged in No. 10 cans. The pH of the solution in the imported cans is 3.97"; (2) "citric acid is used to enhance flavors, increase preservative effectiveness, retard discoloration and conserve energy by reducing heat-processing requirements in vegetable processing"; (3) "[i]n Spain, the merchandise . . . is packed in cans which are [then] subjected to a thermal process which expels air, [and] then [are] hermetically sealed and further heated for the purpose of rendering the product commercially sterile"; and (4) "[n]o lactic fermentation occurred prior to exportation from Spain." Parties' Joint Statement of Material Facts as to Which There Are No Genuine Issues to be Tried ¶¶ 6–9 ("Joint Statement"). The court finds that this action is not ripe for summary judgment as there are material facts in dispute as to whether the merchandise is: (1) "provisionally preserved" and (2) "unsuitable for immediate consumption." The court examines each in turn.

DISCUSSION

1.      *Provisionally preserved*

Plaintiff argues that the merchandise is properly classifiable under Heading 0711 because it was "provisionally preserved." Specifically, Plaintiff argues that "[t]he merchandise before the Court consists of quartered artichokes in cans, exported from Spain, which have been provisionally preserved in a water, salt and citric acid solution." Pl.'s Mem. Supp. Mot. Summ. J. at 2 ("Pl.'s Mem."). Plaintiff further states that "[b]y definition a provisional solution is of a temporary nature. In the context of this dispute, the Customs Service did not find to the contrary." *Id.* at 9. Furthermore, Plaintiff states that "[Customs] did not dispute the fact that the artichokes were preserved. The subsequent Customs laboratory analysis . . . confirms the presence of a preservative solution." *Id.* at 10. In response, the Government argues that "[t]he imported artichokes are not classifiable in Heading 0711, HTSUS . . . . These artichokes have been permanently preserved inasmuch as they have been cooked, pasteurized and canned." Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. and Support Def.'s Cross-Mot. Cross-Mot. Summ. J at 5–6 ("Def.'s Mem."). While the Government agrees that the term "provisionally preserved" is not defined, *see id.* at 11, the Government disagrees that the merchandise was provisionally preserved.

Although the term "provisionally preserved" is not defined by statute or regulation, Customs has addressed the meaning of this term as used in Heading 0711 by means of a headquarters ruling letter ("HRL"). Customs stated that

>       [l]egal Note 1(a) of Chapter 20, HTSUSA, specifies, as hereto

pertinent, that vegetables prepared or preserved by the processing specified in Chapter 7, HTSUSA, are not covered by the provisions of Chapter 20. We reviewed the various provisions of Chapter 7 as to the preparation or preservation procedures therein. Those provisions generally describe vegetables which are fresh, chilled, steamed or dried . . . .

Provisional preservation is a means of preserving fruits or vegetables and preventing undesirable deterioration, for a short time period. It is employed when fruits or vegetables are awaiting further processing, usually during transportation to, or in the storage areas of, processing facilities. In order to prevent spoilage, a variety of methods are employed, among them immersion in high-salt brines, application of chemical preservations, etc. Regardless of the method used, in order to prevent microbiological spoilage, the preservative substance is necessarily applied in a quantity that would render the fruit or vegetable unpalatable. When the product is brought to the processing plant, the provisional preservative substance is removed (usually by washing with water), and final processing, preservation, and packaging is completed.

Provisional preservation may be utilized for fruits or vegetables at various stages. Freshly harvested products may be provisionally preserved to immediately arrest deterioration. For example, a processing plant may not have the capacity to handle a large crop in a short harvest season, and rather than lose product, provisional preservation is used to "hold" the fruit or vegetable until it can be used. On the other hand . . . provisional preservation may be used to halt microbiological fermentation after it has reached a desired level. At this point, the fruit or vegetable is placed in a "holding" condition as above. In either case, the fruit or vegetable has been provisionally preserved.

In considering whether these vegetables would be considered as provisionally preserved under the Harmonized System we consulted the Explanatory Notes (EN) to the Harmonized System which represent the opinion of the tariff classification experts at the international level. The relative explanatory note (EN 70.11), specifies that vegetables which have been treated solely to ensure their provisionally [sic] preservation during transport or storage prior to use are included in Heading 0711 of the Harmonized Tariff System provided they remain unsuitable for immediate

consumption in that state. The EN excludes items which, in
addition to having been provisionally preserved in brine, have been
specially treated (e.g., by soda solution, by lactic fermentation).

HRL 952738 (Jan. 27, 1993); *see also* HRL 959361 (Apr. 17, 1997) (citing HRL 952738) ("In

general, vegetables are provisionally preserved by being placed into a medium or subjected to a

treatment that, for a limited time, halts or significantly reduces undesirable microbiological

deterioration. The purpose of provisional preservation is to prevent the loss of the product while

in transit or awaiting processing."); HRL 956850 (Mar. 22, 1996) (citing HRL 952738). Indeed,

both parties agree that Customs's interpretation of the term "provisionally prepared" refers to a

temporary condition. *See* Def.'s Mem. at 13 (quoting HRL 952738); Pl.'s Mem. Opp'n Def.'s

Cross-Mot. Summ. J. at 4 (citing HRL 952738 and stating "Customs Headquarters ruling . . .

appears to support the position taken by plaintiff on the meaning of 'provisional preservation.'").

Thus, all sources and parties are in agreement that the term "provisionally preserved" refers to a

type of preservation that is temporary in nature.


Whether or not the merchandise has been "temporarily" preserved is a genuine issue of

material fact in dispute. Specifically, while the parties agree that the merchandise has been

rendered "commercially sterile," *see* Joint Statement ¶ 8, they nowhere address the temporal state

of preservation of the merchandise.[2] In other words, the court must know how long the

---

[2]     Although the parties nowhere address the definition of the term "commercially
sterile," as stated by one authority: "canned foods are 'commercially sterile,' which means that
they are safe from a public health standpoint and the few organisms that do survive the heat
treatment normally will not multiply and spoil the food over a period of 2 yrs or more." 2
ARNOLD H. JOHNSON & MARTIN S. PETERSON, ENCYCLOPEDIA OF FOOD TECHNOLOGY 442
(1974); *see* 2 MILTON E. PARKER *et al.*, ELEMENTS OF FOOD ENGINEERING 266 (1954) (citing 3
                                                                              (continued...)

merchandise would be preserved were it to remain canned.

2.        *Unsuitable for immediate consumption*

Plaintiff also contends that the merchandise is properly classifiable under Heading 0711

in part because it is "unsuitable for immediate consumption."  Plaintiff states that

> [t]he imported artichokes are used by plaintiff as an ingredient in
> its vegetable salads and appetizers. . . .  The imported artichokes
> cannot be used in the manufacture of plaintiff's salads until they
> are first processed in its Cleveland production facility.  The reason
> for this is that the preservative packing solution imparts a harsh
> and bitter, disagreeable taste to the artichokes, thereby rendering
> them unsuitable for their intended use as an ingredient in the
> finished product.  In order to be rendered suitable for use, the
> excessive preservative solution must be removed.

Pl.'s Mem. at 6 (citing Aff. of Mr. Martin Goellnitz, Pl.'s Mem. Attach. 1 ("Goellnitz Aff.");

Aff. of Mr. James O'Malley, Pl.'s Mem. Attach. 2 ("O'Malley Aff.")).  Plaintiff then describes

the processing the merchandise undergoes:

> Processing begins with the placement of the cans of the vegetables
> on the can opener conveyor line.  The can opener removes the lid,
> turns the can upside down, thereby causing the contents to fall unto
> the conveyor belt.  At the same time, the preservative solution is
> drained from the artichokes.  The conveyor line moves the
> artichokes towards a mixing station.  As the product moves on the

---

[2](...continued)
C.O. BALL, FOOD RESEARCH 13–52 (1938)) ("The term 'commercially sterilizing' is used in the sense . . . that 'canned food may contain viable spores of a type . . . which will not develop under conditions that are normally maintained during storage of the food'.  For, to sterilize in the sense of the absolute destruction of all living organisms, it would probably be necessary to overcook most foods to such an extent that they would be unsuitable for sale.").  While it appears that, with reference to these definitions, merchandise that has been rendered "commercially sterile" would be in a more permanent state of preservation than that contemplated by Heading 0711, absent further factual development on this matter the court will not second-guess the parties' intent with respect to the meaning of this term.

conveyor belt, it passes under a series of eleven high-powered jets
which spray water in a fan shape over the product . . . to remove
preservative solution absorbed by the artichokes.

After the artichokes have been cleansed, they fall from the
conveyor belt into a mixing sink. Any remaining solution drains
through a grating located in the middle of the mixing sink. . . . At
this point, all of the excess preservative solution has been removed
from the artichokes and they are in condition ready for use as an
ingredient in the final product.

Once all of the excess preservative solution has been removed, the
artichokes are mixed with other ingredients, peppers. To this,
plaintiff adds corn oil, lemon juice, water, garlic, parsley, oregano,
potassium sorbate and sodium benzoate. In addition to serving as a
flavoring agent, along with the oils and herbs, the lemon juice acts
as an anti-oxidant to prevent discoloration of the artichokes and
increases the shelf life of the salad by increasing its acidity.

Pl.'s Mem. at 6–7; *see* Goellnitz Aff. ¶¶ 3–4, 7–8; O'Malley Aff. ¶¶ 5–8, 10–11. Plaintiff

concludes that

it has demonstrated that the imported artichokes have unacceptable
levels of preservative solution which renders them unfit for their
intended use. . . . [P]laintiff has shown that the excess preservative
solution must be removed by processing the artichokes after
importation. This intermediate processing is a necessary step in
making the artichokes suitable for their intended use as an
ingredient in artichoke salads.

Pl.'s Mem. at 7–8. The Government counters that Plaintiff admits the merchandise is edible in

its imported condition, but that it is only "unsuitable for immediate consumption" as an

ingredient in Plaintiff's salads. *See* Def.'s Mem. at 18 (citing Goellnitz Aff. ¶ 9).[3]

---

[3]     By this affidavit Plaintiffs state that "[t]he artichokes are edible in their imported
condition, but have a disagreeable taste which prevents them from being put to their intended use
without further processing by Sidari's."

The court finds that whether the merchandise is "unsuitable for immediate consumption" to be a genuine issue of material fact in dispute. Specifically, while Plaintiff argues that the merchandise is unsuitable for immediate consumption *in its salads* and is only made suitable for that purpose through further processing, Plaintiff makes no argument that the merchandise is not generally suitable for immediate consumption. Indeed, although it seems to acknowledge that the merchandise has a "disagreeable taste" prior to processing, the Government appears to argue that the merchandise is suitable for immediate consumption in some situations. As such a material issue of fact remains with respect to this issue.[4]

CONCLUSION

Although the parties are in agreement that there are no material facts in dispute in this matter, the court does not concur. By the facts now before the court it is not possible to ascertain whether the merchandise is "provisionally preserved" or "unsuitable for immediate

---

[4]     Plaintiff also states that "[u]pon arrival in this country, the artichokes are stored in our dry warehouse. The average time that the cans of artichokes remained in warehouse was one month." Goellnitz Aff. ¶ 4. The court understands Plaintiff's point to be that the merchandise was only "temporarily" stored in cans at its warehouse. While this may be true, there is no indication of how long the merchandise was *actually* in the cans, i.e., including time spent at the manufacturer's warehouse, during transport from Spain, and at any interim stopping points along the way.

consumption" within the meaning of HTSUS Heading 0711. Thus, summary judgment is not

appropriate for either party pursuant to USCIT R. 56(c). Therefore, the court denies both

Plaintiff's motion for summary judgment and the Government's cross-motion for the same.


_____
Richard K. Eaton

Dated: September 5, 2003
        New York, New York