**Slip Op. 04-81**

**United States Court of International Trade**

UNITED STATES,

         Plaintiff,

      v.

ITT INDUSTRIES, INC., d/b/a
ITT JABSCO,

         Defendant.

Before: Pogue, Judge

Consol. Court No. 97-01777

[Plaintiff's motion for summary judgment granted in part, denied in part.  Defendant's motion denied.  Trial ordered.]

Decided: July 8, 2004

Peter D. Keisler, Assistant Attorney General, Barbara S. Williams, Attorney-in-Charge, International Trade Field Office, Mikki Graves Walser, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, AnnMarie R. Highsmith, Attorney, Of Counsel, Office of Assistant Chief Counsel, U.S. Bureau of Customs and Border Protection, Edward N. Maurer, Attorney, Of Counsel, Office of Assistant Chief Counsel, U.S. Bureau of Customs and Border Protection, for Plaintiff.

Barnes, Richardson & Colburn (Rufus E. Jarman, Jr., Diane A. MacDonald, Helena D. Sullivan) for Defendant.

**OPINION**

**Pogue, Judge**: Plaintiff United States Bureau of Customs and

Border Protection[1] moves for summary judgment pursuant to USCIT

---

[1]Effective March 1, 2003, the United States Customs Service was renamed the United States Bureau of Customs and Border Protection.  See Homeland Security Act of 2002, Pub. L. No. 107-296 § 1502, 2002 U.S.C.C.A.N. (116 Stat.) 2135, 2308; Reorganization Plan Modification for the Department of Homeland

Rule 56, seeking payment of a civil penalty, together with pre-judgment and post-judgment interest.  Defendant ITT Industries, Inc., d/b/a ITT Jabsco ("Jabsco"), opposes Plaintiff's motion and moves for summary judgment, asserting that because Customs improperly calculated the actual loss of antidumping duties Jabsco owed, the agency also inappropriately assessed the civil penalty. Accordingly, Jabsco seeks a refund of excess antidumping duties paid with interest, and either a reassessment of the penalty owed based upon the correct calculation of antidumping duties or a rescindment of the penalty demand.  Jurisdiction is predicated on 28 U.S.C. § 1581(a) (1988) and 28 U.S.C. § 1583 (1988).[2]  For the

---

Security, H.R. Doc. No. 108-32, at 4 (2003).

[2]This case arises from the Court's consolidation of two separate actions: a denied protest action, Court No. 97-00379, and a penalty action, Court No. 97-01777.  The former action, filed by Defendant, proposed jurisdiction under 28 U.S.C. § 1581(a) or (i), infra, while the latter, filed by Plaintiff, proposed jurisdiction under 28 U.S.C. § 1582, the statutory provision granting this Court jurisdiction to hear civil penalty claims.

Title 28 U.S.C. § 1581(a) states that "[t]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930." 28 U.S.C. § 1581(a).  Subsection (i) contains the Court's residual jurisdiction, and provides, in part, that:

> the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States . . . that arises out of any law of the United States providing for--
> . . .
> (2) tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue;

reasons discussed below, the Court grants Plaintiff's motion for summary judgment in part, denies its motion in part, and denies Jabsco's motion for summary judgment. The Court orders trial on the penalty amount.

## Background

The Department of Commerce issues antidumping duty orders for

---

> . . .
> (4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section.

28 U.S.C. § 1581(i). Section 1583 states in relevant part that:

> [i]n any civil action in the Court of International Trade, the court shall have exclusive jurisdiction to render judgment upon any counterclaim . . . if (1) such claim or action involves the imported merchandise that is the subject matter of such civil action, or (2) such claim or action is to recover upon . . . customs duties relating to such merchandise.

28 U.S.C. § 1583.

Jabsco argues that the Court has independent jurisdiction over its claim for a refund of duties under 28 U.S.C. § 1581(a), or in the alternative, § 1581(i). Def.'s Mem. Supp. Mot. Summ. J. at 6 ("Def.'s Mem."). Plaintiff, in response, concedes jurisdiction, but nevertheless, contends that the Court lacks independent jurisdiction over the denied protest action because Jabsco failed to satisfy the statutory prerequisites for filing an independent action under either subsection (a) or (i) of 28 U.S.C. § 1581. See Pl.'s Resp. to Def. Mot. Summ. J. at 6-7 ("Pl.'s Resp."). The Court does not reach these arguments here, as it has previously considered and decided the parties' jurisdictional dispute. Order to Show Cause and Memorandum (May 30, 2001).

imported merchandise that is sold in the United States below its fair market value and materially injures or threatens to injure a domestic industry. See 19 U.S.C. § 1673d. These orders impose antidumping duties reflecting the difference between the foreign exporter's sales price and the domestic price of the subject merchandise. See 19 U.S.C. § 1673e(a)(1). Upon the entry of merchandise covered by an antidumping order, an importer is required to make a deposit of estimated duties. See 19 U.S.C. § 1673e(a)(3).

The actual liquidation[3] of entries subject to an antidumping order may occur years after importation. Before final liquidation, any interested party may request an administrative review of the antidumping order. See 19 U.S.C. § 1675. The final results of such a review serve as the basis for the actual assessment of antidumping duties on entries of merchandise covered by Commerce's determination. 19 U.S.C. § 1675(a)(2). Commerce publishes the final results of an administrative review in the Federal Register, and later issues liquidation instructions to Customs directing that agency to collect antidumping duties at the rates determined in the review proceeding. Id.; 19 C.F.R. § 353.53a(c)(8); see Consol. Bearings Co. v. United States, 348 F.3d 997, 1002 (Fed. Cir. 2003) ("Commerce's liquidation instructions direct Customs to implement

_____

[3]Liquidation is defined as "the final computation or ascertainment of the duties or drawback accruing on an entry." 19 C.F.R. § 159.1 (1988).

the final results of administrative reviews."); J.S. Stone, Inc. v.

United States, 27 CIT ___, ___, 297 F. Supp. 2d 1333, 1338 (2003)

("Commerce issues its final results [of the administrative review]

and directs Customs to collect the appropriate antidumping

duties."). If an interested party fails to request an

administrative review, Commerce generally directs Customs to

liquidate the merchandise at the cash deposit rates in effect at

the time the merchandise entered the United States, which rate is

published in the Federal Register as the "all others" cash deposit

rate, see J.S. Stone, Inc., 27 CIT at __, 297 F. Supp. 2d at 1344

(internal citation omitted); 19 C.F.R. § 353.53a(d)(1),[4] unless

that party received an individual rate in the original

investigation. Antidumping and Countervailing Duty Proceedings:

Assessment of Antidumping Duties, 68 Fed. Reg. 23,954, 23,959

(Dep't Commerce May 6, 2003) (notice of policy concerning

---

[4]For the full text of 19 C.F.R. § 353.53a(d)(1), see infra p. 31.

Effective April 27, 1989, Commerce's regulations were revised to conform to the provisions of the Trade and Tariff Act of 1984. See Antidumping Duties, 54 Fed. Reg. 12,742, 12,742 (Dep't Commerce Mar. 28, 1989) (final rule); Antidumping Duties, 54 Fed. Reg. 13,294, 13,294 (Dep't Commerce Mar. 31, 1989) (correcting the effective date of the final rule issued three days earlier). The revisions reorganized the regulations, renumbering this provision, known as the automatic assessment regulation, to 19 C.F.R. § 353.22(e). See Antidumping Duties, 54 Fed. Reg. at 12,756. That provision was again renumbered to its current regulatory provision, 19 C.F.R. § 351.212(c)(1), as of June 18, 1997. See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,296, 27,392 (Dep't Commerce May 19, 1997) (final rule) ("1997 Rule").

assessment of antidumping duties) ("Assessment Notice").

Defendant Jabsco, a division of ITT Corporation, manufactured and sold marine and other liquid pumps, which incorporated cylindrical roller bearings and/or radial ball bearings, types of antifriction bearings, in the United States.  Jt. Statement Mat'l Facts Not in Dispute, Def.'s Ex. 1 paras. 1-3 ("Jt. Stat.").[5] Jabsco imported through the Port of Los Angeles seventy entries of bearings from a related party in the United Kingdom, ITT Jabsco UK ("Jabsco UK"), between November 1988 and April 1991.  Id. paras. 5-7.  Jabsco UK, which also manufactured and sold marine and other liquid pumps incorporating the same bearing components, purchased the bearings from a division of SKF Ltd. in the United Kingdom. See id. paras. 3-4, 6; Letter from Rufus E. Jarman, Jr., Barnes, Richardson & Colburn, to Imp. Specialist Androvich, Dist. Dir. of Customs, Customs, Pl.'s Ex. 2 at 1 (June 5, 1992); Jabsco's Responses to Pl.'s First Interrogatories and Request for Production of Documents Directed to Def., Pl.'s Ex. 1 para. 17(a) ("Jabsco's Inter. Resp.").  The bearings, however, were manufactured by SKF

---

[5]The Court notes that the summary judgment record contains evidence compiled by the parties and attached to their various memoranda.  For purposes of clarity, the Court will reference exhibits attached to the parties original motions for summary judgment as such: the respective party name, exhibit and the corresponding exhibit number, followed by the pinpoint page or paragraph reference.  Defendant's exhibit attached to its Memorandum of Law in Response to Plaintiff's Motion for Summary Judgment will be referenced as "Def.'s Resp. Ex. 1."  Also, Customs' incorporation by reference of an exhibit from a previously filed motion will be cited as "Pl.'s Orig'l Ex. 5d."

companies located in France, Germany, and Italy.  See Jt. Stat., Def.'s Ex. 1 para. 3; Pl.'s Mem. Supp. Mot. Summ. J. at 3 ("Pl.'s Mem.").  Upon receipt, Jabsco UK placed the bearings into its inventory and shipped them to Jabsco as needed.  Jabsco's Inter. Resp., Pl.'s Ex. 1 para. 5(a).

Jabsco described the bearings entered between November 1988 and August 1990 as "pump parts" on the Entry Summaries; entries made between September 1990 and April 1991 were either described as "needle roller bearings" or "pump parts."  Jt. Stat., Def.'s Ex. 1 paras. 9-10.  Customs subsequently liquidated the entries as identified between December 1988 and December 1991, id. para. 8, incorrectly classifying the bearings as other parts of pumps for liquids under subheading 8413.91.90 of the Harmonized Tariff Schedule of the United States ("HTSUS"),[6] 19 U.S.C. § 1202, or Item 660.97 of the Tariff Schedules of the United States ("TSUS"), the predecessor classification statute, or as needle roller bearings under subheading 8482.40.00, HTSUS.  See Jt. Stat., Def.'s Ex. 1 paras. 12-13.[7]

---

[6]The HTSUS became effective on January 1, 1989.  Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1217, 1988 U.S.C.C.A.N. (102 Stat.) 1107, 1163; Rollerblade, Inc. v. United States, 112 F.3d 481, 483 (Fed. Cir. 1997).

[7]Merchandise classifiable under subheading 8413.91.90, HTSUS, includes:

8413            Pumps for liquids, whether or not fitted with a measuring device; liquid elevators; part thereof . . . :

Properly identified at the time of entry, the bearings would have been subject to pending antidumping duty investigations and subsequent orders.  Id. para. 14.  Jabsco neither made any cash deposits of estimated antidumping duties, nor participated in any of Commerce's review proceedings involving the bearings.  Id. paras. 19-20.  Rather, on October 30, 1991, Jabsco voluntarily disclosed to Customs that it had incorrectly identified the seventy bearing entries as "pump parts" or "needle roller bearings" on its Entry Summaries, a violation of 19 U.S.C. § 1592(a).[8]  See Jt.

_____

```
    . . .
                        Parts:
    8413.91                 Of pumps:
    . . .
    8413.91.90                  Other.
```

Subheading 8413.91.90, HTSUS (1989-91); U.S. Int'l Trade Comm'n Report to Congress and the Pres., Investigation with Respect to the Operation of the Harmonized System Subtitle of the Omnibus Trade and Competitiveness Act of 1988, at 10 & n.100 (June 1990) ("ITC Report").  Merchandise classifiable under Item 660.97, TSUS, includes:

```
            Pumps for liquids, whether or not fitted with a
            measuring devices; . . . and parts thereof:
    . . .
    660.97      Other.
```

Item 660.97, TSUS (1988); ITC Report at 7 n.54.  Merchandise classifiable under subheading 8482.40.00, HTSUS, includes:

```
    8482            Ball or roller bearings, and parts thereof:
    . . .
    8482.40.00                  Needle roller bearings.
```

Subheading 8482.40.00, HTSUS (1989-91); ITC Report at 10 & n.100.

[8]For the full text of 19 U.S.C. § 1592(a), see infra p. 23.

Stat., Def.'s Ex. 1 paras. 12-13, 46-47; Letter from Rufus E.

Jarman, Jr., Barnes, Richardson & Colburn, to Dist. Dir. of

Customs, Customs, Pl.'s Ex. 3 at 1-2 (Oct. 30, 1991) ("Prior

Disclosure Letter").[9]  That letter offered to tender "any" actual

lost duties within thirty days of Customs' notification of its

---

[9]Jabsco contends that had it been on notice that its bearings were subject to antidumping duties, among other things, it may have participated in the administrative review proceedings.  Def.'s Mem. at 18 n.4, 29.  Jabsco, however, fails to provide any affidavits or other evidence to support its contention.  Because Jabsco's contention lacks support on the record, and is therefore mere speculation, the Court does not reach this argument.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact.") (internal citation omitted); Novartis Corp. v. Ben Venue Labs., Inc., 271 F.3d 1043, 1046 (Fed. Cir. 2001) ("Summary judgment must be granted against a party who has failed to introduce evidence sufficient to establish the existence of an essential element of that party's case, on which the party will bear the burden of proof at trial.") (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

Jabsco makes no claim that it was unaware of its errors at the time of the administrative reviews.  The Court notes therefore that Jabsco could have participated in the administrative review proceedings, in addition to filing its prior disclosure letter, as the anniversary months for interested parties to initiate an administrative review of Commerce's final results occurred in May 1990 for the first review and May 1991 for the second.  See 19 C.F.R. § 353.53a(a); Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from Germany, 54 Fed. Reg. 18,992, 18,992 (Dep't Commerce May 3, 1989) (final determinations of sales at less than fair value); Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from France, 54 Fed. Reg. 19,092, 19,092 (Dep't Commerce May 3, 1989) (final determinations of sales at less than fair value); Antifriction Bearings (Other Than Spherical Plain and Tapered Roller Bearings) and Parts Thereof from Italy; and Spherical Plain Bearings and Parts Thereof, from Italy, 54 Fed. Reg. 19,096, 19,096 (Dep't Commerce May 3, 1989) (final determinations of sales at less than fair value).

calculation of duties.  Prior Disclosure Letter, Pl.'s Ex. 3 at 2.

Five days later, Customs notified Jabsco that it was required to pay $36,344.50 in regular customs duties and $681,127.50 in antidumping duties.  Jt. Stat., Def.'s Ex. 1 para. 49.  Payment was required within thirty days for Jabsco to perfect its "prior disclosure."  Id.[10]  Customs' calculation of such duty amounts was

---

[10]Title 19 C.F.R. § 162.74(a) states that:

> [a] prior disclosure is made if the person concerned discloses the circumstances of a violation (as defined in [19 C.F.R.] § 162.71(e) of this part), in writing to [Customs] before, or without knowledge of, the commencement of a formal investigation of that violation, and makes a tender of any actual loss of duties.

19 C.F.R. § 162.74(a).  The phrase "discloses the circumstances of [a] violation" is defined in the regulations at 19 C.F.R. § 162.71(e) and provides:

> (e) Discloses the circumstances of [a] violation. When used in [19 C.F.R.] § 162.74(a), the term "discloses the circumstances of the violation" means the act of providing to Customs a written statement which:
>     (1) Identifies the class or kind of merchandise involved in the violation;
>     (2) Identifies the importation included in the disclosure by entry number or by indicating each Customs port of entry and the approximate dates of entry;
>     (3) Specifies the material false statements or material omissions made; and
>     (4) Sets forth to the best of the violator's knowledge, the true and accurate information or data which should have been provided in the entry documents, and states that the person will provide any information or data which is unknown at the time of disclosure within [thirty] days of the initial disclosure date or within an extension of the [thirty]-day period as [Customs] may permit in order for the person to obtain the information or data.

based on the cash deposit rates for estimated antidumping duties and the application of liquidation instructions from Commerce for antifriction bearings subject to antidumping duties at the time Jabsco's bearings entered the United States. Id. para. 50. The first instructions, dated June 25, 1991, directed Customs to liquidate all entries of bearings during the period November 9, 1988 through April 30, 1990 and assess antidumping duties at the cash deposit rate required at the time of entry, unless the company had requested an administrative review. Id. para. 31. Those instructions were corrected on June 9, 1992. As corrected, the instructions ordered Customs to liquidate bearing entries using the "all others" rate if the bearings were exported by original equipment manufacturers ("OEMs") to a related affiliate in the United States and the OEMs had not requested administrative review, but only if the bearings were originally produced by a manufacturer listed in the June 25, 1991 instructions. Id. para. 32. The instructions further noted that if the exporter was not an OEM, but the other conditions existed, Customs should continue to suspend all bearing entries. Id. The second set of instructions, dated June 10, 1992, repeated the June 25, 1991 and June 9, 1992 instructions, but applied to bearing entries during the period May

---

19 C.F.R. § 162.71(e).

1, 1990 through April 30, 1991.  See id. para. 39.[11]  Jabsco subsequently remitted the customs duties on December 18, 1992, but informed Customs that it disagreed with the amount of antidumping duties assessed.  Id. paras. 51-52.

A year later, on December 22, 1993, Customs informed Jabsco that it had negligently "'failed to exercise due care in ascertaining or recording the truth of the facts or in ascertaining [its] obligations under Customs laws.'"  Id. para. 53 (quoting Demand for Duty Statement, Pl.'s Ex. 5 at 3 (Dec. 22, 1993)).[12]  Customs further demanded that Jabsco owed $619,515.33 in antidumping duties under 19 U.S.C. § 1592(d),[13] and issued a prepenalty notice in the amount of $217,874.16, the interest on the antidumping duties owed by Jabsco from the dates the bearings entered the United States to the date of the notice.  Jt. Stat., Def.'s Ex. 1 paras. 54-55.  Jabsco unsuccessfully appealed Customs'

---

[11]The June 25, 1991 and June 9, 1992 instructions applied to bearing entries from Germany, France and Italy.  See Jt. Stat., Def.'s Ex. 1 paras. 31-32.  The June 10, 1992 instructions, however, were formulated into two separate instructions; one instruction, message number 216115 applied only to bearing entries from Germany, while the second, message number 2162114, applied only to bearing entries from France and Italy.  Id. para. 39.  The Court notes that collectively, these three instructions are hereinafter referred to as "Commerce's liquidation instructions," except where otherwise specified.

[12]Jabsco does not dispute its negligence in this case. E.g., Def.'s Mem. at 30 (stating that "Jabsco was no more 'negligent' than Customs").

[13]For the full text of 19 U.S.C. § 1592(d) see infra note 19.

calculation of the antidumping duties a month later.  Id. paras. 56, 58.

Customs subsequently informed Jabsco on August 9, 1996 that it was required to remit the full amount of antidumping duties within fourteen days for Jabsco to perfect its prior disclosure; the letter also stated that Customs would issue a penalty if full payment of those duties was not received.  Jt. Stat., Def.'s Ex. 1 para. 59.  Eleven days later, Jabsco tendered the full amount of antidumping duties owed.  Id. para. 60.

In January 1997, Customs confirmed that Jabsco had perfected it prior disclosure.  Id. para. 61.  Seven months later, on July 21, 1997, Customs issued a Notice of Penalty to Jabsco in the amount of $109,418.81, the interest on the antidumping duties from the dates the entries were filed to the date of Jabsco's prior disclosure on October 30, 1991.  Id. para. 62.  Jabsco's refusal to pay the penalty assessed sparked this lengthy litigation.

**Standard of Review**

Pursuant to USCIT Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  USCIT Rule 56(c); see also Celotex Corp. v. Catrett, 477 U.S. at 322.

"[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted). The Court credits the nonmovant's evidence and draws all justifiable inferences from that evidence in the nonmovant's favor. Netscape Communications Corp. v. Konrad, 295 F.3d 1315, 1319 (Fed. Cir. 2002) (citing Anderson, 477 U.S. at 255). The nonmovant's burden to produce specific facts, however, is only triggered after the movant has met its initial burden of making a prima facie showing that the nonmovant cannot prevail at trial. See Celotex Corp., 477 U.S. at 323.

The Court reviews the parties' motions for summary judgment de novo, as the instant action was brought under the penalty provisions codified at 19 U.S.C. § 1592. 19 U.S.C. § 1592(e)(1); see also United States v. Golden Ship Trading Co., slip. op. 01-07, at 5 (CIT Jan. 24, 2001) (same); United States v. Snuggles, Inc., 20 CIT 1057, 1058, 937 F. Supp. 923, 925 (1996) (same) (internal citations omitted).

**Issues Presented**

The Court must decide whether Customs properly calculated Jabsco's civil penalty in the amount of $109,418.81. The Court's

determination necessarily turns on whether Customs properly calculated the actual loss of antidumping duties Jabsco owed. The Court will identify the parties' arguments first before addressing the issues presented.

**Parties' Arguments**

Plaintiff argues that Customs properly calculated the amount of antidumping duties of which the United States was deprived as a result of Jabsco's negligent violation of 19 U.S.C. § 1592(a). Pl.'s Mem. at 13, 24. Plaintiff makes two alternative arguments in support of that contention. First, Plaintiff contends that the "all others" cash deposit rate was the applicable rate because Jabsco and Jabsco UK were OEMs at the time Jabsco entered the bearings, and as such, would have been required by Commerce's liquidation instructions to pay that rate on the bearing entries if entered properly. See Pl.'s Mem. at 19-20. Jabsco argues in response that while Jabsco UK and Jabsco could be considered OEMs of products such as marine and other liquid pumps, they do not manufacture antifriction bearings, and therefore, cannot be considered OEMs. Def.'s Resp. Mem. to Pl.'s Mot. Summ. J. at 9 ("Def.'s Resp."). Moreover, Jabsco argues that Plaintiff has failed to clearly specify its definition of an OEM as it applies to this case. Id.

Second, assuming Jabsco and Jabsco UK are not OEMs, Plaintiff

contends that the "all others" cash deposit rate still would have applied to Jabsco's entries of bearings under Commerce's liquidation instructions because Jabsco failed to participate in Commerce's administrative review proceedings and SKF did not include those entries in any administrative review. See Pl.'s Mem. at 13-14, 23 (citing J.S. Stone, Inc. v. United States, 27 CIT at ___, 297 F. Supp. 2d at 1333); Pl.'s Mem. Resp. to Questions Raised by the CIT During July 2, 2002 Teleconference at 6-9 & n.3[14] ("Pl.'s

---

[14]Customs cites to several other liquidation instructions issued by Commerce between December 1996 and November 1999 to support its contention. Pl.'s Teleconf. Mem. at 7-9 & n.3 (citing E-mail from Dir., Imp. Operations, Commerce, to CMC Dirs. and Port Dirs., Customs, Liquidation Instructions for Antifriction Bearings (Other Than Tapered Roller Bearings) & Parts Thereof From Germany by SKF Germany (A-428-201, 203, 205) (Dec. 6, 1996) (on file with the Court); E-mail from Dir., Imp. Operations, Commerce, to CMC Dirs. and Port Dirs., Customs, Liquidation Instructions for AFBS From Germany Produced by SKF Germany (A-427-201, 203, 205) (May 12, 1998) (on file with the Court); E-mail from Dir., Imp. Operations, Commerce, to CMC Dirs. and Port Dirs., Customs, Liquidation Instructions for AFBS and Parts Thereof From Germany For the Period 11/9/88 Through 4/30/90 (A-428-201, 203, 205) (Aug. 4, 1998) (on file with the Court); E-mail from Dir., Trade Enforcement & Control, Commerce, to Dirs. of Field Operations and Port Dirs., Customs, Liquidation Instructions for AFBS, Other Than Tapered Roller Bearings, and Parts Thereof From Germany (A-428-201, 203, 205) (Nov. 4, 1999) (on file with the Court)). In particular, on December 6, 1996, Commerce issued confidential liquidation instructions covering cylindrical bearings and ball bearings, among other types of antifriction bearings, from Germany for the period November 9, 1988 to April 30, 1990. E-mail from Dir., Imp. Operations, Commerce, to CMC Dirs. and Port Dirs., Customs, Liquidation Instructions for Antifriction Bearings (Other Than Tapered Roller Bearings) & Parts Thereof From Germany by SKF Germany (A-428-201, 203, 205) (Dec. 6, 1996) (on file with the Court). Those instructions directed Customs to only liquidate antifriction bearing entries manufactured and imported by SKF companies (and other named companies not relevant here). Id.; see also E-mail

from Dir., Imp. Operations, Commerce, to CMC Dirs. and Port
Dirs., Customs, <u>Liquidation Instructions for Antifriction
Bearings (Other Than Tapered Roller Bearings) & Parts Thereof
From France Produced by SKF France (A-427-201, A-427-205)</u> (Dec.
6, 1996) (on file with the Court) (applying the same instructions
to antifriction bearings from France for the same period); E-mail
from Dir., Imp. Operations, Commerce, to CMC Dirs. and Port
Dirs., Customs, <u>Liquidation Instructions for Antifriction
Bearings (Other Than Tapered Roller Bearings) & Parts Thereof
From Italy By SKF Italy (A-475-201, 203)</u> (Dec. 6, 1996) (on file
with the Court) (applying the same instructions to antifriction
bearings from Italy for the same period).  The instructions did
not specifically mention Jabsco or Jabsco UK.

     Over seventeen months later, Commerce again issued
confidential liquidation instructions covering cylindrical
bearings and ball bearings, among other types of antifriction
bearings, from Germany for the period May 1, 1990 to April 30,
1991.  E-mail from Dir., Imp. Operations, Commerce, to CMC Dirs.
and Port Dirs., Customs, <u>Liquidation Instructions for AFBS From
Germany Produced by SKF Germany (A-427-201, 203, 205)</u> (May 12,
1998) (on file with the Court).  Those instructions also only
applied to antifriction bearings manufactured <u>and</u> imported by SKF
companies (and other specifically named exporters or importers
not relevant here).  <u>Id.</u>; <u>see also</u> E-mail from Dir., Imp.
Operations, Commerce, to CMC Dirs. and Port Dirs., Customs,
<u>Liquidation Instructions for AFBS From France Produced by SKF
France (A-427-201-012)</u> (May 12, 1998) (on file with the Court)
(applying the same instructions to antifriction bearings from
France for the same period); E-mail from Dir., Imp. Operations,
Commerce, to CMC Dirs. and Port Dirs., Customs, <u>Liquidation
Instructions for AFBS From Italy Produced by SKF Industries
S.P.A. (SKF Italy) (A-475-201, 203)</u> (May 12, 1998) (on file with
the Court) (applying the same instructions to antifriction
bearings from Italy for the same period).  The instructions again
did not specifically mention Jabsco or Jabsco UK.

     In August 1998, Commerce directed Customs to liquidate any
suspended entries of antifriction bearings from Germany not
covered by any previous instructions for the period November 9,
1988 through April 30, 1990 at the deposit rate required at the
time of entry.  E-mail from Dir., Imp. Operations, Commerce, to
CMC Dirs. and Port Dirs., Customs, <u>Liquidation Instructions for
AFBS and Parts Thereof From Germany For the Period 11/9/88
Through 4/30/90 (A-428-201, 203, 205)</u> (Aug. 4, 1998) (on file
with the Court).  On November 4, 1999, Commerce issued the same
instructions for suspended bearings entries for the period May 1,
1990 to April 30, 1991.  E-mail from Dir., Trade Enforcement &

Teleconf. Mem.")).[15]

Jabsco responds that the rate determined in the administrative reviews for its manufacturer, SKF, applies because SKF was aware that the bearings sold to Jabsco UK were destined for the United

---

Control, Commerce, to Dirs. of Field Operations and Port Dirs., Customs, <u>Liquidation Instructions for AFBS, Other Than Tapered Roller Bearings, and Parts Thereof From Germany (A-428-201, 203, 205)</u> (November 4, 1999) (on file with the Court).

Jabsco contends that all of the liquidation instructions upon which Plaintiff relies, including those discussed immediately above, are inapplicable because Jabsco's entries were liquidated and consequently final. Def.'s Mem. at 11. Jabsco argues that the entries were therefore out of the reach of Commerce's ability to assess antidumping duties. <u>Id.</u> Jabsco, however, is wrong. The instructions dated prior to Customs' assessment of the antidumping duties on December 22, 1993 are probative of the decisions Commerce would have made but-for Jabsco's violation of § 1592(a), and "Commerce, not Customs, calculates antidumping duties." <u>Mitsubishi Elecs. Am., Inc. v. United States</u>, 44 F.3d 973, 976 (Fed. Cir. 1994); <u>see</u> 19 U.S.C. § 1675(a)(2).

The later instructions described immediately above, however, hold no probative value because those instructions came after December 22, 1993, the date Customs' assessed the antidumping duties Jabsco owed, and after August 9, 1996, the date Customs confirmed on that the amount assessed was properly calculated. In other words, these later instructions did not exist at the time Customs determined how Commerce would have assessed the antidumping duties but-for Jabsco's negligent violation of § 1592(a). Customs' reliance on the later instructions is therefore misplaced. Consequently, the Court will not consider the instructions described immediately above in support of Customs' motion for summary judgment.

[15]Plaintiff's Response Memorandum to Defendant's Motion for Summary Judgment incorporates by reference all arguments contained in a previously submitted memorandum entitled Plaintiff's Memorandum in Response to Questions Raised by the Court of International Trade, per the Honorable Donald C. Pogue, Judge, During the July 2, 2002, Teleconference, filed on July 22, 2002. Pl.'s Resp. at 8 n.3.

States.  See Def.'s Resp. at 4 (citing Gill Aff., Def.'s Ex. 2;[16]

Assessment Notice, 68 Fed. Reg. at 23,954).  Jabsco claims that,

because SKF possessed such knowledge, Commerce would have concluded

that SKF was the source of the dumping activity and applied that

company's rates against Jabsco's entries.  Id. at 5-6 (citing

Antifriction Bearings (Other Than Tapered Roller Bearings) and

Parts Thereof From the Federal Republic of Germany, 56 Fed. Reg.

31,692, 31,747 (Dep't Commerce July 11, 1991) (final results of

antidumping duty administrative review) ("First Review Determ.")).

In response to Jabsco's arguments, Customs contends Jabsco has

failed to present any evidence demonstrating that the SKF companies

possessed such knowledge for two reasons.  First, the Court should

disregard the Gill affidavit because the affiant attests to facts

beyond his personal knowledge in violation of USCIT R. 56(e),

thereby rendering the affidavit inadmissible.  See Pl.'s Resp. at

4-6.[17]  Second, Commerce previously concluded in the administrative

reviews that SKF did not know that its sales to Jabsco UK were used

other than for home market consumption during the relevant periods

of review and therefore did not include such sales in those

---

[16]Jabsco submitted the affidavit of Michael Gill ("Gill affidavit"), Managing Director of Jabsco UK, in support of its knowledge contention.

[17]The Court will not reach Customs's contention that the Court should also disregard Jabsco's exhibit 3, containing an affidavit of Larry K. Dart, because Jabsco does not specifically rely on or cite to that evidence for support of any of its contentions.

reviews. <u>See</u> <u>id.</u> at 10-12 (citing <u>First Review Determ.</u>, 56 Fed.

Reg. at 31,741).

In its motion for summary judgment, Jabsco argues that SFK's

cash deposit rates are the applicable rates for assessing the

actual loss of antidumping duties. Jabsco contends it was

Commerce's policy at the time the bearings entered the United

States to apply the manufacturer's cash deposit rates to any

reseller importing such merchandise regardless of the importer's

participation in the review, even though that policy was unclear,

inconsistent, and confusing. <u>See</u> Def.'s Mem. at 18-21 (citing

<u>Consol. Bearings Co.</u>, 348 F.3d at 1005-06; <u>ABC Int'l Traders, Inc.</u>

<u>v. United States</u>, 19 CIT 787, 790 (1995); <u>Nissei Sangyo Am., Ltd.</u>

<u>v. United States</u>, slip. op. 03-105 (CIT Aug. 18, 2003); <u>Renesas</u>

<u>Tech. Am., Inc. v. United States</u>, slip. op. 03-106 (CIT Aug. 18,

2003); <u>Assessment Notice</u>, 68 Fed. Reg. at 23,955).[18]

---

[18]Jabsco sets forth a second argument in support of its
contention that the rates determined in the administrative
reviews for SKF should apply in this case. Because SKF's annual
administrative review rates are more accurate than the cash
deposit rates, <u>see</u> Def.'s Mem. at 26, because Customs held the
"sole responsibility" for properly classifying the bearings at
the time of entry, <u>id.</u> at 28, and because bearings were commonly
misidentified as "pump parts" between November 1988 and April
1990, <u>id.</u> at 13 (citing Riedl Aff., Def.'s Ex. 4), Jabsco urges
the Court to apply its equity powers and calculate the
antidumping duties under SKF's first and second administrative
review rates. <u>Id.</u> at 29-30; <u>see also</u> Def.'s Reply to Pl.'s Resp.
to Mot. Summ. J. at 2, 11. The Court does not reach this
argument, because an equitable determination of what rate should
apply requires the Court to weigh the factual circumstances
presented and make credibility determinations. The Court simply
cannot perform that analysis on summary judgment. <u>McKesson HBOC,</u>

With respect to the penalty assessed, Plaintiff argues that Customs calculated an appropriate penalty under 19 U.S.C. § 1592(c)(4)(B). See Pl.'s Mem. at 25. Plaintiff claims that the penalty here consists of the amount of interest accrued from the dates of liquidation of Jabsco's entries to the date of Jabsco's

---

Inc. v. Islamic Republic of Iran, 271 F.3d 1101, 1110 (D.C. Cir. 2001) ("[T]he role of the court at summary judgment is not to resolve the issue, but to determine whether the available evidence creates a genuine issue of fact for trial.") (internal citation omitted); Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994) (noting that a trial court's role on a motion for summary judgment "in short, is confined . . . to issue-finding; it does not extend to issue-resolution"). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whe[n] he is ruling on a motion for summary judgment . . . ." Anderson, 477 U.S. at 255; see also Beachcombers, Int'l, Inc. v. Wildewood Creative Prods., Inc., 31 F.3d 1154, 1160 (Fed. Cir. 1994) (explaining that the jury's function is to weigh the evidence before it and make credibility determinations therefrom, and that the court cannot usurp this role). At the summary judgment stage, the court's function is to determine whether there is sufficient evidence for a reasonable fact finder to return a verdict in the nonmovant's favor and warrant a trial. See Anderson, 477 U.S. at 249 (internal citation omitted). Because the Court does not reach Jabsco's argument, it also need not discuss Plaintiff's responses.

The issue is also not appropriate for trial because the penalty statute mandates the imposition of duties that would have been assessed but-for the § 1592 violation; the Court simply has no discretion where, as here, the amount of lawful antidumping duties which should have been collected is determined as a matter of law. See infra pp. 23-24; see Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946) (stating that a federal court's equitable jurisdiction is only limited when a "clear and valid legislative command" exists, and that "[u]nless a statute in so many words, or by a necessary or inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied") (internal citation omitted).

disclosure letter on October 30, 1991, rather than, as statutorily permissible, the date Jabsco actually tendered the antidumping duties on August 6, 1996.  Id. at 26.  Moreover, Plaintiff claims that no penalty was assessed on the customs duties which Jabsco remitted in 1993.  For these reasons, Plaintiff contends the amount of penalty assessed here was "substantially less than the actual maximum penalty afforded under § 1592(c)(4)(B)."  Id. at 27.

In response, although Jabsco contends that the penalty amount is the maximum penalty statutorily permitted, Jabsco also asserts that Customs failed to consider the numerous factors set forth in United States v. Yuchius Morality Co., slip. op. 02-124, at 23 (CIT Oct. 18, 2002) (citing United States v. Complex Mach. Works, Co., 23 CIT 942, 949-50, 83 F. Supp. 2d 1307, 1315 (1999)) in assessing the penalty, and therefore, the penalty amount is inappropriate. See Def.'s Resp. at 10, 13.  Jabsco further argues that Customs did not extend any special treatment to it in calculating the penalty amount, but rather, assessed the penalty consistent with its prior disclosure practice.  See id. at 12-13 (citing Customs Mem. from Charles D. Ressin, Chief, Penalties Branch, to Office of Fines, Penalties and Forfeitures, Customs, Jabsco Products: Los Angeles Port Case No. 94-2704-20283, Def.'s Resp. Ex. 1 para. 2 (July 18, 1996)).

**Discussion**

## A. Calculation of Antidumping Duties

Neither party disputes that, in accordance with 19 C.F.R. §
162.74(a), Jabsco voluntarily disclosed the circumstances of its
negligent violation of 19 U.S.C. § 1592(a) to Customs on October
30, 1991.  Jt. Stat., Def.'s Ex. 1 para. 46.  Subsection 1592(a)
states, among other things, that no person may negligently enter
merchandise into the United States and deprive the United States of
any lawful duty thereon.  See 19 U.S.C. § 1592(a); see also United
States v. Blum, 858 F.2d 1566, 1568 (Fed. Cir. 1988).
Specifically, 19 U.S.C. § 1592(a) provides, in pertinent part:

> Without regard to whether the United States is or may be
> deprived of all or a portion of any lawful duty thereby
> no person, by . . . negligence —-
>     (A) may enter, introduce, or attempt to enter or
>     introduce any merchandise into the commerce of the United
>     States by means of --
>         (i) any document, written or oral statement, or act
>     which is material and false, or
>         (ii) any omission which is material . . . .

19 U.S.C. § 1592(a).  Once Customs determines that a violation of
§ 1592(a) has occurred, it must restore all lost lawful duties
resulting from such violation of subsection (a) and issue a written
penalty claim.  19 U.S.C. § 1592(b)(2), (d).[19]  The Federal Circuit

---

[19]Subsection (b) describes the procedures Customs follows in
pursuing a claim for a monetary penalty resulting from a
violation of subsection (a).  19 U.S.C. § 1592(b).  Subsection
(d) states in part:

> [I]f the United States has been deprived of lawful
> duties as a result of a violation of subsection (a) of

has defined the phrase "lawful duties" as including "those [duties] that would have been collected by the United States but[-]for the violation of [§ 1592(a)]." United States v. Blum, 858 F.2d at 1569. Thus, Customs must restore all lost duties which would have been collected but-for the party's negligent entry of merchandise. 19 U.S.C. § 1592(a), (d); see also Pentax Corp. v. Robison, 125 F.3d 1457, 1463 (Fed. Cir. 1997) (stating that § 1592(d) requires "nothing less than but-for causation"); Blum, 858 F.2d at 1570 ("Subsection (d) allows the United States to recover duties that would have been paid but-for conduct that violates subsection (a)."); United States v. Menard, Inc., 16 CIT 410, 416, 795 F. Supp. 1182, 1187 (1992) ("[T]he purpose of § 1592(d) is to make the government whole for revenue lost as a result of submission of false statements to Customs.").

At the time of entry, the parties agree that the bearings should have been subject to antidumping duties.[20] Because Jabsco negligently misidentified the bearings, Customs did not collect any antidumping duties. But-for Jabsco's negligent misidentification,

---

this section, the appropriate customs officer shall require that such lawful duties be restored, whether or not a monetary penalty is assessed.

19 U.S.C. § 1592(d).

[20]The parties also agree that the bearings were subject to customs duties. Jt. Stat., Def.'s Ex. 1 para. 51. Jabsco has not presented any legal objections to the assessment of those duties.

Customs would have collected antidumping duties at the cash deposit rates in effect at the time Jabsco made the bearings entries. The parties do not dispute these points; instead, the parties dispute the applicable rates at which the entries would have been liquidated after the completion of the administrative reviews.

Neither the penalty nor the antidumping statutory provisions explain how Customs should calculate the lost antidumping duties in this case. Rather, but-for Jabsco's negligent violation of § 1592(a), Commerce, as statutorily mandated, would have determined the applicable duty rates during the first and second administrative review proceedings. See 19 U.S.C. § 1675(a)(2); Mitsubishi Elecs. Am., Inc. v. United States, 44 F.3d 973, 976 (Fed. Cir. 1994) ("Commerce, not Customs, calculates antidumping duties."); J.S. Stone, Inc. v. United States, 27 CIT at __, 297 F. Supp. 2d at 1338 ("Customs' role in liquidating antidumping duties is ministerial. Customs has no authority to modify Commerce's determination and may liquidate entries only at the rate set by Commerce.") (citing Royal Business Machs., Inc. v. United States, 1 CIT 80, 87 & n.18, 507 F. Supp. 1007, 1014 & n.18 (1980)). Over the course of such review proceedings, Commerce would have examined data related to the manufacturer and any third-party resellers exporting the subject merchandise to the United States and rendered final results identifying the applicable antidumping duties. Subsequently, Commerce would have issued liquidation instructions

implementing those final results to Customs.

In the instant case, Customs argues that, but-for Jabsco's violation of § 1592(a), the "all others" cash deposit rate would have been assessed against the bearing entries for two independent reasons. First, Plaintiff argues that the "all others" cash deposit rate applies because Commerce's liquidation instructions direct the application of that rate against OEMs like Jabsco and Jabsco UK. To support that contention, Customs points to Jabsco's concession that it was an OEM,[21] and Commerce's characterizations of OEMs in both the Preamble to the 1997 Rule and an e-mail transmitted after the first and second administrative reviews from Commerce to Customs. Pl.'s Teleconf. Mem. at 2-4 (quoting 1997 Rule, 62 Fed. Reg. at 27,303; E-mail from Dir., Imp. Specialist Div., Commerce, to Reg'l Dirs., Commercial Operations Dist., Area and Port Dirs. of Customs, Customs, Bond and Cash Deposit Rates to be Used for Exporters/Manufacturers of Antifriction Bearings Subject to Antidumping, Pl.'s Orig'l Ex. 5d para. 2 (Feb. 3, 1993) ("Feb. 3 Instruction")). Jabsco, in response, denies that it was an OEM in its purchase transactions of bearings because neither Jabsco nor Jabsco UK manufacture antifriction bearings. It does however concede that it may be an OEM with respect to its

---

[21]As both parties concede, the Court has previously indicated that it does not view Plaintiff's statement as an admission for litigation purposes. Def.'s Mem. at 14 n.2; Pl.'s Teleconf. Mem. at 2. Accordingly, Jabsco's statement does not support Plaintiff's claim.

transactions of marine and other liquid pumps.  Jabsco further argues that Customs has failed to clearly define what constitutes an OEM for purposes of this litigation.

Commerce's liquidation instructions, as conceded by Customs, do not define what constitutes an OEM.[22]  The Preamble describes OEMs as "nonproducing exporters."  Pl.'s Teleconf. Mem. at 3 (quoting 1997 Rule, 62 Fed. Reg. at 27,303).  Commerce's e-mail describes an OEM as a "related party transaction in which either party produces goods for sale to unrelated concerns."  Pl.'s Teleconf. Mem. at 4 (quoting Feb. 3 Instruction, Pl.'s Orig'l Ex. 5d para. 2).  The message goes further to state that "[w]hile both parent and subsidiary may jointly produce an end product, the normal configuration is for the parent to manufacture the article and the subsidiary to either sell and/or service those products. It is not necessary for the domestic importer to be the manufacturing operation."  Id.

In this case, Jabsco UK served as the exporter of the bearings to Jabsco.  Jabsco UK did not produce those bearings. Accordingly, the record supports Customs' contention that Jabsco UK is an OEM under the Preamble's description.  Jabsco and Jabsco UK are related parties and both produce marine and other liquid pumps for sale to unrelated parties.  Neither party, however, produces the bearings

---

[22]The Court notes that Commerce's descriptions of OEMs, upon which Plaintiff relies, do not appear to fit the plain meaning of the term OEMs itself.

at issue here.  Although the e-mail's description does not limit the manufacturing requirement to the subject merchandise of the review, it seems inconsistent for Plaintiff to argue that Jabsco UK constitutes an OEM under the Preamble's characterization of that term because Jabsco UK does not produce the subject merchandise, antifriction bearings, and in turn, contend that the e-mail description is satisfied because both Jabsco and Jabsco UK produce "goods," i.e., marine and other liquid pumps, but not antifriction bearings.  Under a plain reading of the two descriptions, it seems that the "goods" produced should be the same in each description in order that the descriptions may be interpreted consistently. Consequently, without further evidence to support its claim that Jabsco and Jabsco UK constitute OEMs, the Court cannot find that Customs has adequately supported that claim on the record here.  As Customs has failed to produce evidence sufficient to establish the existence of an essential element to its case, Anderson v. Liberty Lobby, Inc., 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); Celotex Corp. v. Catrett, 477 U.S. at 322-23, the Court finds Customs has failed to shoulder its initial burden demonstrating prima facie entitlement to summary judgment with regard to its claim that the "all others" cash deposit rate should have applied to Jabsco or Jabsco UK as an OEM.

Alternatively, Plaintiff argues that the "all others" cash deposit rate still applies because Jabsco did not participate in the administrative reviews and because SKF did not include those entries in either administrative review.  Jabsco responds that the rate determined in the administrative reviews for its manufacturer, SKF, applies because SKF was aware that the bearings sold to Jabsco UK were destined for the United States.  Jabsco claims that because SKF possessed such knowledge, Commerce would have concluded that SKF was the source of the dumping activity and applied that company's cash deposit rates against Jabsco's entries.  Customs makes two arguments in response: first, the Court should disregard the Gill affidavit because that evidence contains statements beyond the personal knowledge of the affiant, and second, Commerce determined in the administrative reviews that SKF did not possess such knowledge.[23]  Therefore, Plaintiff contends that Jabsco has failed to present any evidence demonstrating that the SKF companies knew the bearings in question here were destined for the United

---

[23]Customs also cites to a comment response that Commerce issued during the first administrative review to demonstrate both that Jabsco cannot prove SKF knew the subject bearings were destined for the United States and also that the bearings were not included within the administrative reviews.  Pl.'s Resp. at 10-12 (citing First Review Determ., 56 Fed. Reg. at 31,741). Because that comment focuses on sales transactions by respondents like SKF to OEMs in the home market, and Customs has failed to present sufficient evidence supporting its claim that either Jabsco UK or Jabsco were OEMs, supra pp. 27-28, the Court concludes Commerce's response also cannot support Customs' contention.

States; consequently, those entries were excluded from the administrative review proceedings. The Court first will discuss Customs' contention that because Jabsco did not participate in the administrative reviews, the "all others" cash deposit rate would have applied, as this contention is well established in the law.

Section 1675 sets forth the framework for administrative reviews of antidumping duty orders. Under 19 U.S.C. § 1675(a)(2), the final results of an administrative review are "the basis for the assessment of antidumping duties on entries of merchandise included within the determination and for deposits of estimated duties." Id. This subsection, however, explicitly limits the application of the final results of an administrative review to those entries covered by the review. "If the review did not examine a particular importer's transaction, then that importer's entries enjoy no statutory entitlement to the rates established by the review." Consol. Bearings Co., 348 F.3d at 1005-06. Put simply, the "entries" must be "covered by the determination" for the importer to gain statutory entitlement to the review's results as the "basis for the assessment" of duties. Id. at 1006 (internal citation omitted).

While Commerce is statutorily required to apply the final results to those transactions covered in the administrative review, subsection 1675(a)(2) does not compel or prevent Commerce from applying the results to entries outside the review. See Consol.

Bearings Co., 348 F.3d at 1006. Commerce's regulations, however, state that if the agency does not receive a timely request for an administrative review, Commerce will assess the subject merchandise at the cash deposit rates of estimated antidumping duties required at the time of entry. 19 C.F.R. § 353.53a(d)(1). Often referred to as the "automatic assessment regulation," it reads:

> [I]f [Commerce] does not receive a timely request [for an administrative review], [Commerce] . . . will instruct [Customs] to assess antidumping duties on the merchandise . . . at rates equal to the cash deposit of (or bond for) estimated antidumping duties required on that merchandise at the time of entry, or withdrawal from warehouse, for consumption. . . .

19 C.F.R. § 353.53a(d)(1); see also Mitsubishi Elecs. Am., Inc., 44 F.3d at 976-77 ("[A]n interested party [wanting] Commerce to assess duties at the actual, rather than the estimated, rate of dumping . . . may request administrative review of the duties . . . . If no party makes such a request, Commerce instructs Customs automatically to assess duties at the estimated rate."); see generally Floral Trade Council v. United States, 17 CIT 392, 394-98, 822 F. Supp. 766, 768-71 (1993). Thus, regardless of the structure of a sales transaction, at the time in question here, Commerce applied the "all others" cash deposit rate to importers who failed to participate in a review, provided the importer was not assigned an individual rate in an earlier proceeding. See 19 C.F.R. § 353.53a(d)(1); Antidumping Duties, 54 Fed. Reg. 12,742, 12,757 (Dep't Commerce Mar. 28, 1989) (final rule) (stating that

"when no interested party requests an administrative review, [Commerce] will instruct Customs to liquidate the entries for that review period at the rate deposited at the time of entry"); see 1997 Rule, 62 Fed. Reg. at 27,313-14 (Commerce "has decided to continue its current practice with respect to automatic assessment; i.e., if an entry is not subject to a request for a review, [Commerce] will instruct [Customs] to liquidate that entry and assess duties at the rate in effect at the time of entry.") (emphasis supplied);[24] see Assessment Notice, 68 Fed. Reg. at 23,959 ("Based on [Commerce's] prior practice, when an entity has not been assigned a rate from a previously completed segment of a proceeding and that entity does not participate in a current review, that entity is subject to the all-others rate and its imports of subject merchandise are assessed at that rate.");[25] see also Consol.

---

[24]During the promulgation of the 1997 Rule, Commerce considered changing the automatic assessment regulation to assess duties on entries for which there was no review request at the rates determined in the most recent review. 1997 Rule, 62 Fed. Reg. at 27,313. "In light of the comments received," Commerce declined to make such a change and declared that it would continue its practice of applying automatic assessment to unreviewed entries. Id. at 27,313-14.

[25]Recently, Commerce finalized the Assessment Notice, which clarified its automatic assessment regulation, 19 C.F.R. § 351.212(c), regarding automatic liquidation where a reseller exports the subject merchandise. Assessment Notice, 68 Fed. Reg. at 23,954. According to that notice, Commerce will not automatically liquidate merchandise imported from a reseller and produced by a manufacturer covered by an administrative review at the existing cash deposit rates. Id. Instead, Commerce will determine whether the manufacturer had knowledge that the merchandise sold to the reseller was destined for the United

Bearings Co., 348 F.3d at 1006-07 (finding that the importer who purchased the merchandise through a reseller and did not participate in the manufacturer's administrative review was not statutorily entitled to that manufacturer's dumping rates over the cash deposit rates, but remanding the matter to determine whether Commerce's actions were consistent with its practice in effect during the years 1997-1998); J.S. Stone, Inc., 27 CIT at __, 297 F. Supp. 2d at 1345 (affirming Commerce's application of the "all others" cash deposit rate to an importer whose manufacturer failed to identify its sales in the administrative review where the importer did not participate in that review proceeding).[26,27]

_____

States.  Id.  If the manufacturer possessed such knowledge, Commerce will apply the manufacturer's rate to the importer in question.  Id.  On the other hand, if the manufacturer did not possess such knowledge, Commerce will apply the "all others" rate.  This pronouncement applies to all administrative reviews as of May 1, 2003. Id. at 23,956.  Contrary to Jabsco's contention, and as argued by Customs, the Assessment Notice does not support Jabsco's arguments for summary judgment.  Because Commerce conducted the first and second administrative reviews in 1990 and 1991 respectively, the notice does not apply to the instant case.  Consol. Bearings Co., 348 F.3d at 1006-07 (finding the Assessment Notice inapplicable for determining Commerce's practice at the time of that case).  "At most, Commerce's recent policy statements . . . help identify Commerce's consistent past-practice."  See id. at 1007.

[26]Even though Jabsco argues that Plaintiff's reliance on J.S. Stone, Inc., 27 CIT at ___, 297 F. Supp. 2d at 1333, is misplaced because that case did not involve a reseller transaction, and is therefore, factually distinguishable, Def.'s Resp. at 8, the Court finds that factual distinction insignificant.  J.S. Stone, Inc. stands for the legal proposition that a party must seek administrative review of its merchandise to avoid Commerce's application of the automatic assessment regulation or the "all others" cash deposit rate.  See 27 CIT at

     In the instant case, Jabsco imported the bearings from its

_____

___, 297 F. Supp. 2d at 1345.  Consequently, that case legally
supports Customs' argument here that a party must participate in
a review proceeding to gain entitlement to the manufacturer's
specific cash deposit rate.

     [27]Commerce has on occasion ignored its regulation and
instructed Customs to liquidate an importer's entries of
merchandise at the manufacturer's rate established in an
administrative review where two factors, neither applicable here,
existed.  First, the entries were made by an importer who
purchased the merchandise from an unrelated reseller and the
importer did not participate in the administrative review.
Second, Commerce did not assess in the review proceeding any
rates other than the manufacturer's specific rate; put
differently, Commerce did not assess an "all others" cash deposit
rate.  See e.g., ABC Int'l Traders, Inc. v. United States, 19 CIT
787, 790 (1995) (finding Commerce's application of the
manufacturer's rate to the plaintiff-importer appropriate because
the importer should have known that the manufacturer's rate, the
only existing rate, would be assessed against it, and Commerce
was "compelled" in that instance to apply the manufacturer's cash
deposit rate "because no reseller rates exist[ed]"); see Nissei
Sangyo Am., Ltd. v. United States, slip. op. 03-105, at 5, 9-10,
15 (CIT Aug. 18, 2003) (holding Commerce's liquidation
instructions directing Customs to assess antidumping duties at
the manufacturer's cash deposit rate arbitrary and capricious
because those instructions contradicted prior instructions
directing Customs to assess the duties at the rate determined in
the administrative review for the importer's manufacturer and no
other rate was assessed in the review proceedings); see Renesas
Tech. Am., Inc. v. United States, slip. op. 03-106, at 5, 9-10,
15 (CIT Aug. 18, 2003) (same).
     Commerce's Assessment Notice also identifies two other
instances in which it has applied the manufacturer's rates
calculated in the administrative review over the importer-
specific assessment rates.  Assessment Notice, 68 Fed. Reg. at
23,958-59.  Those instances include circumstances in which the
reviewed manufacturer failed to produce any information from
which Commerce could analyze its sales, leading Commerce to apply
adverse facts available to the entries, or lengthy litigation
caused significant time to pass and, in the interest of avoiding
additional delay or possible errors, Commerce applied the
weighted-average margins of the final results.  Id. (internal
citations omitted).  Because neither party suggests that either
circumstance exists in the instant case, the Court makes no
express holding relating thereto.

reseller, Jabsco UK.  The bearings were entered, classified, and liquidated as "pump parts" or "needle roller bearings."  But-for Jabsco's negligent misidentification of the bearings, i.e., its violation of § 1592(a), those entries would have been suspended at the time of entry and Jabsco would have been required to make cash deposits of estimated antidumping duties.  Because neither Jabsco UK nor Jabsco participated in the administrative reviews, Jabsco UK's exports were not covered by the two administrative review proceedings, and more importantly, Jabsco's imports were not included within the scope of the administrative reviews.  Consol. Bearings Co., 348 F.3d at 1005-06.  In other words, Jabsco simply has no entitlement under subsection 1675(a)(2) to the manufacturer-specific antidumping rates assessed in the review proceedings as opposed to the "all others" cash deposit rates.  Id. at 1006.  Moreover, Commerce's automatic assessment regulation, that regulation's history and case law support Plaintiff's contention that Jabsco's failure to participate in the administrative review proceedings would have led to the application of the "all others" cash deposit rate as a matter of law.

Jabsco, however, claims that actual participation in the administrative proceedings here was not necessary for the application of its manufacturer's cash deposit rates, because SKF knew that the bearings sold to Jabsco UK were destined for the United States.  Jabsco relies on the affidavit of Michael Gill,

Jabsco UK's Managing Director, to support its contention. Customs objects to the admissibility of that evidence.[28]

Gill attests that Jabsco UK purchases bearings from various SKF companies without a "preference as to where . . . SKF manufactures particular [bearing] models." Gill Aff., Def.'s Ex. 2. He asserts that SKF's sales representative visited Jabsco UK's office regularly between the years 1988 and 1991, and that the representative was fully aware of Jabsco and Jabsco UK's sales arrangement, which sales caused SKF bearings to enter the United States. Id. In particular, Gill states:

> Jabsco's practice of consolidating orders for the United Kingdom and the United States has always been well known to the SKF representative who has been fully aware of the practice of consolidation and the reasons for it. Thus, SKF has long been well aware that a large portion of the merchandise which Jabsco UK purchases from SKF is destined for the United States and was so aware during the period 1989-1991. SKF is also fully aware that we do this as an accommodation for our United States sister business and not to make a profit. Thus, SKF is aware that we resell their bearings to the United States at cost, effectively at the prices which SKF charges.

Id.

---

[28]Although Customs has not filed a formal motion to strike the affidavit, it has clearly, succinctly, and timely presented its USCIT R. 56(e) objections to the affidavit in its Response Memorandum to Defendant's Motion for Summary Judgment. As such, Customs has not waived its objections. 11 James Wm. Moore et. al., Moore's Federal Practice § 56.14(4)(a) (3d ed. 2004) ("A party is not required to make a formal motion to strike exhibits that do not conform to Rule 56(e) in order to remove documents from a court's consideration of a summary judgment motion."). Consequently, the Court must determine whether Jabsco's affidavit presents admissible evidence at trial in order for the Court to consider it here. See id.

While Gill is presumed to have personal knowledge of the acts of his corporation, Jabsco UK, see FDIC v. Patel, 46 F.3d 482, 484 (5th Cir. 1995) (finding that a former bank employee and bank loan officer had sufficient personal knowledge of bank procedures and computer record keeping information that their affidavits were admissible under the business records exception and admissible as proper summary judgment evidence); 11 Moore et. al., Moore's Federal Practice § 56.14(1)(c) (stating that "corporate officers are presumed to have personal knowledge of acts of their corporation"), that presumption does not extend to the acts and knowledge of another company, SFK. See id. Jabsco's affidavit therefore contains testimony that goes beyond the personal knowledge of the affiant. As such evidence is inadmissible at trial, the Court must disregard it here as well. USCIT R. 56(e) ("Supporting . . . affidavits shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence . . . ."); Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc., 45 F.3d 1550, 1561 n.5 (Fed. Cir. 1995) (same); 11 Moore et. al., Moore's Federal Practice § 56.14(1)(d) ("[A]n affidavit that only contains . . . statements made without personal knowledge should not be admitted at the summary judgment stage.") (footnote citations omitted).

As the nonmovant, Jabsco bears the burden of demonstrating with specific facts that a genuine issue of material fact exists,

and that trial is warranted. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Although the Court views the evidence in the light most favorable to Jabsco, Jabsco nonetheless must come forward with "significant probative evidence" to supports its claims. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249 (internal citation omitted). Jabsco does not present any other evidence supporting its contention that SKF knew the subject bearings were destined for the United States, an essential element to its claim that Commerce would have applied the rate determined in the administrative reviews for SKF. Accordingly, Customs has satisfactorily demonstrated the absence of evidence on the record to support Jabsco's contention. <u>Conroy v. Reebok Int'l, Ltd.</u>, 14 F.3d 1570, 1575 (Fed. Cir. 1994) ("The moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the district court that there is an absence of evidence to support the nonmoving party's case.") (citing <u>Copelands' Enters., Inc. v. CNV, Inc.</u>, 945 F.2d 1563, 1565 (Fed. Cir. 1991) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 325)).[29] With respect to its alternative argument,

_____

[29]Jabsco also cites the <u>Assessment Notice</u> to support its contention that because SKF knew the subject bearings were destined for the United States, Commerce would have applied SKF's rates in the instant case. That claim cannot stand for two reasons. First, as previously determined above, in light of the effective dates of the <u>Assessment Notice</u>, that notice's pronouncement of Commerce's <u>current</u> reseller policy provides no evidentiary support for Jabsco's contentions on summary judgment. Second, as Plaintiff points out, because Jabsco has failed to

Customs has met its burden of production.

Jabsco, however, vehemently argues in its motion that it was Commerce's policy at the time the bearings entered the United States to apply the manufacturer's cash deposit rates to any reseller importing such merchandise regardless of the importer's participation in the review, even though that policy was confusing, unclear, and inconsistent. Jabsco relies on Consol. Bearings Co., ABC Int'l Traders, Inc. v. United States, Nissei Sangyo Am., Ltd. v. United States, Renesas Tech. Am., Inc. v. United States, and the Assessment Notice to evidence Commerce's policy. The Court will discuss each citation reference in turn.

In Consol. Bearings Co., the Federal Circuit Court of Appeals was asked to determine whether Commerce's liquidation instructions, ordering Customs to assess antidumping duties at the cash deposit rates against an importer who purchased the merchandise through a reseller where that importer did not participate in the administrative review, were inconsistent with Commerce's past practice, and therefore, arbitrary and capricious. 348 F.3d at

---

present any evidence showing that SKF possessed such knowledge, Commerce's current reseller policy, as described in the Assessment Notice, indicates that the agency would have applied the "all others" rate. Pl.'s Resp. at 13; Assessment Notice, 68 Fed. Reg. at 23,954 (stating that if Commerce determined during the review that the producer did not know the merchandise it sold to the reseller was destined for the United States and the reseller did not participate in that review, the reseller's entries of merchandise shall be liquidated at the "all others" rate).

1006. While Consol. Bearings Co. presents an issue somewhat similar to that at bar, the court there did not find Commerce's actions inconsistent. Rather, the circuit court remanded the matter for further consideration. 348 F.3d at 1007. Moreover, the actions of Commerce in question there took place over six years after Jabsco entered its bearings, lending little support to what Commerce would have done at the time in question here. Cf. id. (indicating that Commerce issued the liquidation instructions in question there during the years 1997 and 1998), with supra p. 6 (indicating that Jabsco entered the bearings between the years 1988 and 1991). Accordingly, that case does not support Jabsco's contention.

Jabsco has also failed to demonstrate how the circumstances presented are similar to ABC Int'l Traders, Inc. v. United States, Nissei Sangyo Am., Ltd. v. United States and Renesas Tech. Am., Inc. v. United States as a matter of law. Unlike these three cases, supra note 27, Commerce did indeed assess an "all others" cash deposit rate in the administrative review proceedings here. More importantly, dissimilar from the importers' there, Jabsco misidentified the bearings; it simply could not have expected that its entries would be liquidated at any other rates than those which applied to "pump parts" or "needle roller bearings." Accordingly, Jabsco could not have expected its bearings to receive the rates assessed for SKF in the administrative review proceedings. Those

three cases therefore fail to support Jabsco's contention.

Finally, Jabsco's reliance on the Assessment Notice is also misplaced.  Commerce's notice unequivocally states its policy involving reseller transactions; Commerce assessed antidumping duties against importers who did not participate in the review at the "all others" rate.

> Based on [Commerce's] prior practice, when an entity has not been assigned a rate from a previously completed segment of a proceeding and that entity does not participate in a current review, that entity is subject to the all-others rate and its imports of subject merchandise are assessed at that rate.

Assessment Notice, 68 Fed. Reg. at 23,959.  Although the Court acknowledges that the words "prior practice" do not clearly identify the time frame in which Commerce endorsed such a practice, Commerce's statement directly contradicts Jabsco's contention that Commerce's policy was unclear and inconsistent.  Id.  Despite the fact that Commerce recognized its reseller policy generally has "generated confusion" among importers, id. at 23,958, 23,954-55 ("In various proceedings parties have claimed that entries should be liquidated at many different rates in cases where entries involving resellers have not been reviewed.  Parties have claimed . . . that the results of [Commerce's] review of the producer should apply, that the rate in effect at the time of entry should apply, or, even, that the all-others rate should apply."), nothing in the Assessment Notice indicates that Commerce applied that policy arbitrarily or inconsistently at the time the bearings here

entered the United States. The Assessment Notice simply does not support Jabsco's contention that it was Commerce's policy at the time Jabsco entered the bearings to assess the manufacturer's rate to reseller transactions. Instead, the notice suggests Commerce would have directed Customs to assess the "all others" rate against Jabsco's entries. Therefore, the Assessment Notice fails to support Jabsco's contention.

Jabsco again fails to present any evidence supporting its contention that it was Commerce's policy to apply the manufacturer's rate to any reseller importing such merchandise at the time the bearings entered the United States. Because Jabsco bears the burden of demonstrating Commerce's policy, the Court finds Jabsco has failed to establish entitlement to summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for th[at party]."); Celotex Corp. v. Catrett, 477 U.S. at 322-23. Customs has however adequately supported its contention that because Jabsco failed to participate in the administrative reviews, or to present any affirmative evidence indicating SKF knew that its sales of bearings were destined for the United States, but-for Jabsco's violation of 1592(a), Commerce would have directed the application of the "all others" cash deposit rate as a matter of law. Jabsco produces no

evidence to the contrary.  The Court therefore concludes that Customs properly calculated the actual loss of antidumping duties Jabsco owed using the "all others" cash deposit rates in effect at the time Jabsco made its entries of bearings.  Summary judgment is proper in Customs favor on this issue.

### B. Penalty Assessment

Customs argues that it properly assessed an appropriate penalty amount pursuant to 19 U.S.C. § 1592(c)(4)(B).  Plaintiff claims that the penalty here consists of the amount of interest accrued from the dates of liquidation of Jabsco's entries to the date of Jabsco's disclosure letter on October 30, 1991, rather than, as statutorily permissible, the date Jabsco actually tendered the antidumping duties, August 6, 1996.  Moreover, Customs claims that no penalty was assessed on the customs duties which Jabsco remitted in 1993.  For these reasons, Plaintiff contends the amount of penalty assessed here was "substantially less than the actual maximum penalty afforded under § 1592(c)(4)(B)."  Pl.'s Mem. at 27.

In response, although Jabsco contends that the penalty amount is the maximum penalty statutorily permitted, Jabsco also asserts that Customs did not consider the numerous factors set forth in United States v. Yuchius Morality Co., slip. op. 02-124, at 23 (citing United States v. Complex Mach. Works Co., 23 CIT at 949-50, 83 F. Supp. 2d at 1315) in calculating the penalty, and therefore,

the amount assessed is not appropriate.  Jabsco further argues that

Customs did not extend any special treatment to it in calculating

the penalty, but rather, assessed the penalty consistent with its

prior disclosure practice.

Congress set forth the maximum penalty amount for negligent

violations of § 1592(a) in 19 U.S.C. § 1592(c)(3).[30]  Parties who

voluntarily disclose violations of subsection (a), however, are

assessed penalties in accordance with 19 U.S.C. § 1592(c)(4), which

states that the maximum monetary penalty assessed shall not exceed

the interest, computed from the date of liquidation, on the amount

of lawful duties of which the United States is deprived.[31]  19

---

[30]Title 19 U.S.C. § 1592(c)(3) provides:

    A negligent violation of subsection (a) of this
section is punishable by a civil penalty in an amount
not to exceed --
        (A) the lesser of --
            (i) the domestic value of the merchandise, or
            (ii) two times the lawful duties of which the United
        States is or may be deprived, or
        (B) if the violation did not affect the assessment of
        duties, [twenty] percent of the dutiable value of the
        merchandise.

19 U.S.C § 1592(c)(3).

[31]Title 19 U.S.C. § 1592(c)(4) provides in relevant part:

    If the person concerned discloses the
circumstances of a violation of subsection (a) of this
section before, or without knowledge of, the
commencement of a formal investigation of such
violation, . . . any monetary penalty to be assessed
under subsection (c) . . . shall not exceed —
    . . .
        (B) if such violation resulted from negligence . .

U.S.C. § 1592(c)(4); see also United States v. Yuchius Morality Co., slip. op. 02-124, at 22 ("Congress has chosen to adopt only maximums, as opposed to prescribing precise penalties, for proven violations under 19 U.S.C. § 1592 . . . ."). These provisions were enacted as part of the Customs Procedure Reform and Simplification Act of 1978, and for the first time, granted judicial review to this Court to determine the "appropriate[] . . . penalty amount." S. Rep. No. 95-778, pt. 10. at 20 (1978), reprinted in 1978 U.S.C.C.A.N. 2211, 2231; United States v. Menard, Inc., 17 CIT 1229, 1229, 838 F. Supp. 615, 616 (1993) ("The penalty statute provides for a trial de novo on all issues, leaving the amount of the penalty to the sound discretion of the [C]ourt.") (citing United States v. Valley Steel Prods. Co., 14 CIT 14, 17, 729 F. Supp. 1356, 1359 (1990)), aff'd in part, vacated and remanded in part on other grounds, 64 F.3d 678 (Fed. Cir. 1995); United States v. Modes, Inc., 17 CIT 627, 636, 826 F. Supp. 504, 512 (1993) ("It is settled . . . that the [C]ourt possesses the discretion to

---

. the interest (computed from the date of liquidation at the prevailing rate of interest applied under section 6621 of title 26) on the amount of lawful duties of which the United States is or may be deprived so long as such person tenders the unpaid amount of the lawful duties at the time of disclosure or within [thirty] days, or such longer period as . . . [C]ustoms . . . may provide, after notice by the appropriate customs officer of his calculation of such unpaid amount.

19 U.S.C. § 1592(c)(4).

determine a penalty within the parameters set by the statute.") (internal citation omitted).  In other words, the law requires "the [C]ourt to begin its reasoning on a clean slate.  It does not start from any presumption that the maximum penalty is the most appropriate or that the penalty assessed or sought by the government has any special weight."  United States v. Menard, Inc., 17 CIT at 1229, 838 F. Supp. at 616 (internal citation omitted).

In Complex Mach. Works Co., the Court identified the following fourteen factors relevant to its penalty determination:  (1) defendant's good faith effort to comply with the statute; (2) defendant's degree of culpability; (3) defendant's history of previous violations; (4) the nature of the public interest in ensuring compliance with the applicable law; (5) the nature and circumstances of the violation; (6) the gravity of the violation; (7) defendant's ability to pay; (8) the appropriateness of the size of the penalty vis-a-vis defendant's business; (9) whether the penalty shocks the conscience of the court; (10) the economic benefit gained by defendant as a result of the violation; (11) the degree of harm to the public; (12) the value of vindicating agency authority; (13) whether the party sought to be protected by the statute has been adequately compensated for the harm; and (14) such other matters as justice may require.  Complex Mach. Works Co., 23 CIT at 949-50, 83 F. Supp. 2d at 1314-15 (stating that the Court will now apply these factors to analyze cases arising under §

1592(c)); <u>see also</u> <u>United States v. New-Form Mfg. Co.</u>, 27 CIT __,

__, 277 F. Supp. 2d 1313, 1327-32 (2003) (applying the factors)

<u>Yuchius Morality Co.</u>, slip. op. 02-124, at 23-25 (stating that the

factors "might apply in a given case," yet considering them in

assessing the appropriate penalty).  Moreover, here the Court must

also determine the weight to be given to the imposition of

antidumping duties, the self-inflicted consequence of Jabsco's

negligence.

     The Court cannot undertake this analysis on summary judgment.

Because the Court has discretion to determine the appropriate

penalty amount, and is cognizant of the fourteen <u>Complex Mach.</u>

<u>Works Co.</u> factors, in making that determination, the Court is

required to weigh evidence, make credibility determinations, and

draw inferences from the facts, functions strictly delegated to a

fact-finder or jury.  <u>Supra</u> note 18.  As the Court cannot properly

perform these functions on summary judgment, the Court must deny

the parties' motions on this particular issue and order a trial.


## Conclusion

     For the foregoing reasons, the Court grants Customs' motion

for summary judgment with respect to the antidumping duties

assessed.  The Court denies, however, Customs' motion for summary

judgment with respect to the penalty assessed.  The Court also

denies Jabsco's motion for summary judgment in full.  Trial is

ordered on the penalty issue.  The parties are directed to prepare a proposed order governing preparation for trial and to file said proposed order by August 1, 2004.

/s/ Donald C. Pogue

Donald C. Pogue

Judge

Dated:      July 8, 2004

New York, New York